Robert **COUNTS, Jr.,** Jerry **Gambrell, Dale Toomer,** Janie **Jeter,** Norman **Bennett,** Connie **M. Davis,** individually and on behalf of all persons similarly situated, Plaintiffs,

v.

**VOORHEES COLLEGE,** an unincorporated educational institution; Rev. J. Kenneth Morris, Chairman of the Board of Trustees of Voorhees College, and Harry P. Graham, Acting President of Voorhees College, Defendants.

**Civ. A. No. 70–279.**

United States District Court, D. South Carolina, Charleston Division.

April 29, 1970.

Fred Henderson Moore, George A. Payton, Jr., Charleston, S. C., Mordecai C. Johnson, Florence, S. C., for plaintiffs.

Terrell L. Glenn, Glenn & Porter, Columbia, S. C., for defendants.

## ORDER

SIMONS, District Judge.

The within class action was commenced in this court by the filing of plaintiffs' complaint on April 8, 1970, seeking to invoke this court's jurisdiction in obtaining a temporary and permanent restraining order directing the defendants to immediately reinstate the named plaintiffs and the class they represent to the defendant College and to have the expulsions heretofore entered by the College authorities against them permanently expunged from their records.

The complaint further alleges that defendant Voorhees College is a private institution partially subsidized by United States Government funds, located in Denmark, South Carolina; that defendant Harry P. Graham is Acting President and that defendant Reverend L. Kenneth Morris is Chairman of the Board of Trustees; further that plaintiffs and a majority of the student body at the College engaged in a vigorous but passive and peaceful protest concerning the non-renewal of the contracts of four professors for the school year 1970–71; that the protest consisted of a mass boycott of classes, distribution of literatures, disagreement with the action of school administration, and involved student demand that Chairman Morris resign as Chairman of the Board of Trustees; further, that plaintiffs and members of the class they represent were either expelled, suspended or placed on a probationary status without having been afforded the benefit of a hearing prior to such disciplinary action being taken against them in violation of the United States constitutional mandate of due process and the rules and regulations of the 1969–70 Voorhees College Student Handbook. The complaint further alleges that such disciplinary action was designed to put a chilling effect upon the exercise of free speech and assembly secured to plaintiffs by the First Amendment to the United States Constitution; and that the closing of the College as a result of such protest and the order requiring all students to vacate the campus had as its ultimate purpose the suppression and frustration of the exercise of free speech and assembly embraced within the First Amendment; that such disciplinary actions constituted an unreasonable exercise of administrative prerogative so as to violate due process of law as guaranteed to plaintiffs by the Fifth and Fourteenth Amendments to the United States Constitution; further, that Voorhees College, "while operating as a private institution is, in fact, quasi public in terms of the vital public service it offers and its intricate inseparable involvement with the public and the state government;" that such disciplinary action against the plaintiffs tends to impose irreparable harm or injury upon them and that they have no plain, adequate, or complete remedy at law.

Simultaneous with the filing of their complaint plaintiffs also filed a notice of motion for an ex parte temporary restraining order without notice pursuant to Rule 65 of the Federal Rules of Civil Procedure, which the court refused to grant without notice to defendants.

In their joint answer filed on April 14, 1970 defendants generally denied any alleged wrongdoing on their part and specifically denied that any of their actions were designed to or taken with the purpose of depriving any of the plaintiffs or other students of the College any constitutional rights guaranteed to them by the First, Fifth and Fourteenth Amendments of the United States Constitution. Defendants further specifically alleged that the plaintiffs had failed either by waiver, or failure to complete, to exhaust the remedies imported to them by the College through exercise of their appeal rights as set forth in the 1969–70 Handbook; on their failure to exhaust administrative remedies plaintiffs lack standing to invoke the jurisdiction of the court, and the answer prays that the complaint be dismissed and that the injunctive relief sought by plaintiffs be denied.

This matter came on for hearing before the court on April 14, 1970 after a conference with counsel for all parties in which the court was advised that each party was prepared to go forward at that time with a full-blown hearing on the merits of the controversy.

Plaintiffs' counsel advised that their main contentions were as follows: (1) That the College had used disciplinary procedures to deny the plaintiffs and the members of the classes they represent, their First Amendment rights of free speech, assembly and peaceful protest. (2) That in the disciplinary proceedings complained of the students were denied due process of law as guaranteed by the Fifth and Fourteenth Amendments. (3) That if it should be determined by the court that due process was in fact afforded the students then the punishment meted out by the College was so severe that it constituted a denial of due process.

The court heard testimony for two full days by giving each party a full opportunity to submit all of the evidence he desired. At the conclusion of the hearing counsel for the parties asked for and were given permission to file written briefs and arguments within one week. The court has now considered this matter and makes the following findings and conclusions:

## FINDINGS OF FACT

Voorhees College is a private, sectarian Liberal Arts College located at Denmark, South Carolina. It is supported by the Episcopal Church, tuitions and student fees. Some of its funds are deriver from Federal assistance programs. It receives no state assistance. It had 716 students on February 20, 1970, the vast majority being Negro.

The campus is located outside the city limits of Denmark, South Carolina, in Bamberg County, which is a small rural community of approximately 4,000 having a limited police force. The Bamberg County Sheriff's Department consists of 4 or 5 men. At the time of the events

giving rise to this controversy, Voorhees College had an armed security force of 5 to 10 men.

In April 1969, the campus experienced aggravated protests which culminated in an armed takeover of two of the College's buildings by some of the students. In order to quell the disturbance it became necessary for state police and guardsmen to occupy the campus. Thereafter the College was closed for a period of time.

On February 4, 1970, six non-tenure faculty members were notified by the Acting President that their contracts would not be renewed the following year. This action was taken pursuant to the procedures outlined in the Faculty Handbook. Soon thereafter students, initially acting through the Student Government Association, demanded of the school administration that they be furnished the reasons for the non-renewal of the contracts of the four Negro faculty members who were included in the group. After several conferences with these student representatives, Acting President Graham advised the students that if the affected faculty members requested hearings the reasons for their terminations would be furnished to each individual faculty member, and that he could then make the reasons public if he chose to do so. The administration notified five of the faculty members of the reasons for the non-renewal of their contracts after a proper request, but it appears that these reasons were never given to the students generally.

On the evening of February 17, 1970, the Black Awareness Coordinating Committee for purposes of protesting the non-rehiring of these faculty members, decided to commence a student boycott of classes, which commenced the following morning. During the boycott threats of reprisal were made toward students not participating. Evidence presented to the court revealed that there were instances of some students being bodily turned away from classes by other students participating in the boycott. The College officials received

reports that some of the students were armed. However, no physical violence occurred, and no arms were found on campus by the Security Guards, but the rumors continued and the suggestion of violence grew, as did the tension and emotion on the campus. On February 19, 1970, the boycott was ninety percent effective, as very few students were then attending their classes.

On Friday, February 20, 1970, at 9:00 a. m., Dr. Graham conferred with the Executive Committee of the Board of Trustees and Counsel for the College. By unanimous vote he was authorized to close the College if he thought it necessary for the protection and safety of the students, faculty, administration, and College property. At 11:00 a. m. a group of students (not associated with the Student Government Association) led by Allen Child and including the plaintiff, Dale Toomer, went to Dr. Graham's office, asserted that they represented a majority of the student body, and presented him with an "ultimatum" that, unless the contracts of the four Negro faculty members were reinstated by 3:00 p. m. they would not be responsible for the violence that might occur. Shortly thereafter Dr. Graham met with his Administrative Council and it was decided to close the College because of their grave concern for the safety of the students and the protection of the College's buildings and property. This decision was announced at 1:00 p. m. and given wide coverage on the campus by a bullhorn and other means. Prior to this time, many of the students had already demanded that Dr. Graham secure from the Board of Trustees the removal of Rev. J. Kenneth Morris as its Chairman. Dr. Graham testified that he had also observed actual physical barricades at the entrances to classroom buildings which prevented students who desired to do so to attend classes; he saw groups of students going around the campus clapping their hands, singing, and going through the girls' dormitories warning them not to leave their rooms to attend classes, or be subject to reprisals

Suspecting that a large number of students would refuse to leave the campus, and that the College's security guards and the Bamberg Sheriff's Department were inadequate to cope with the situation, Dr. Graham immediately requested the assistance of the Governor of South Carolina by a letter signed by him and the Reverend J. Kenneth Morris, Chairman of the Board of Trustees. (Defendants' Exhibit "K").

Busses were provided for students to be transported from the campus to their homes. Many students remained on the campus after the 3:00 p. m. deadline and throughout the remainder of that day and night and on the following day, in open defiance of Dr. Graham's order.

On Saturday, February 21, 1970, the College petitioned for and obtained from the Honorable J. B. Ness, Resident Judge of the Second Judicial Circuit, in Bamberg, a Temporary Restraining Order (Defendants' Exhibit "L") restraining all students, faculty and certain other persons from remaining on the campus. The Order was scheduled to be enforced by proper state and county authorities beginning at 6:00 a. m. Sunday, February 22, 1970; the delay in enforcement was to give those remaining on the campus maximum opportunity to leave voluntarily.

Dr. Graham instructed the College's security guards to patrol the campus at hourly intervals, and by the use of a bullhorn to announce that all persons subject to Judge Ness' Order would be arrested, unless they vacated the campus. This procedure was followed until 5:00 a. m. on February 22, 1970. At 6:00 a. m., State authorities, including National Guardsmen, came upon the campus to enforce the Circuit Court order. Of the two arrests made, one was Jerry Gambrell, named plaintiff herein, and the other was Willie Williams, the President of the Student Government Association.

After an investigation of the situation the Deans of Men and Women originated charges against a large number of students involved actively in the intimi-

dations and harassment of other students; for interfering with and bringing to a halt the orderly administrative and educational functions of the College; disrespect for authority; and disturbing the peace, threatening violence, wilfully disobeying an order of the Acting President to vacate the campus, many of the charges being in direct violation of the Student Rules and Regulations. The students against whom these charges were lodged were duly notified commencing on March 2, 1970. One hundred sixty-three (163) of these notices were forwarded by registered mail by the Chairman of the Discipline Committee to the mailing addresses the students had furnished the College when they registered. The letters contained precise statements of the charges against them and the provisions of the rules and regulations the students were charged with violating, the time and place of the hearings, and a statement that they would be heard before the College Disciplinary Committee in accordance with the provisions of Title II, 4–G, of the Handbook for Voorhees College students 1969–70. (Exhibit "B" to Defendants' Answer). Individual copies of these handbooks had been furnished all students at their registration.

The letter did not specifically advise the students of their right to representation, to present their own witnesses, and the right to question witnesses presented against them by the College at the hearing, as provided for on page 19 of the Handbook; but the Chairman of the Discipline Committee personally advised each of those appearing, prior to his hearing, of these rights, and each was also told that he would be granted a continuance if such were desired.

Of the named plaintiffs and other members of the class, only two students denied having received the registered mail notice of the hearing. One Janie F. Jeter said a notice was picked up by her daughter, Janice Shell, not a student, but the evidence established a mailing to Janie F. Jeter at her correct home address, and she introduced in evidence an envelope addressed to *Janice* F. Jeter at Janie Jeter's address. (Plaintiffs' Exhibit "1".) The other, Dale Toomer, testified that he appeared in Columbia on the day of his hearing and told the press that he and others were boycotting the hearings. He testified in this action that he had refused any of the college proceedings because he considered them "illegitimate" and illegal, and that he decided he had rather file a law suit in federal court.

According to the Student Handbook, the Disciplinary Committee is composed of three students, one of whom shall be the President of the Student Government Association elected by the students, two faculty members and two members from the college administrative staff. It is also provided that any member of the hearing committee who is otherwise interested in the case shall not sit. In this instance, the President of the Student Government Association and the other two student members of the Committee were charged with violations, thereby becoming ineligible to serve. Since the College was closed, making the holding of an election impracticable, Dr. Graham acting on the advice of the Administrative Council, placed the next highest ranking elected representative of the Student Government Association on the committee in order that there would be student representation.

The plaintiffs complained of the removal of the interested students, but asserted no prejudice, and have made no complaints about students selected for replacements.

Plaintiffs also complain that the Dean of Students compiled a list divided into three groups labeled (1) hard core leaders, (2) leaders, and (3) students remaining out of interest, and that such action constituted an administrative determination designed to adversely influence the results of the Disciplinary Committee hearings. The credible evidence established that the actual reason for compiling the list was as an administrative aid to the proper authorities in their determining the number of stu-

dents against whom charges would be brought. In fact, charges were brought against all 163 who appeared on the list. There is no evidence that this list was ever considered by the Committee, or that it played any part in the results of the hearings.

These hearings were held in Columbia, South Carolina, because the Circuit Court's order was still in force restraining the students from coming on the campus. They were commenced on March 9th and continued through March 13, 1970. Eighty-five students appeared and seventy-eight failed to appear. Of those appearing, thirty-one pleaded guilty to the charges, twenty were found guilty as charged, nineteen were found guilty of only a part of the charges, and fifteen were found completely not guilty. The penalties imposed ranged from a maximum of permanent dismissal to a minimum of probation. Of those who failed to appear, thirty-four were found guilty as charged, thirty-four were found guilty of only a portion of the charges, and ten were found not guilty of any charge. The penalties ranged from permanent dismissal to probation for those as well. Two of the students were represented by counsel different from plaintiffs' counsel in this action and continue to be so represented. Each student who appeared was notified of the results at the conclusion of his hearing by the Committee Chairman. Every student was also officially notified later of the Committee action against him by the Dean of Students by registered letter, which also contained a notification of his appeal rights. As of April 15, 1970, twenty-one students had filed appeals before the first appellate committee, and nineteen had been heard with eleven having obtained relief by their penalties being reduced. Plaintiff, Jerry Gambrell, obtained such relief and has pending an appeal to the next appellate committee. Plaintiffs, Norman Bennett and Robert Counts, had their penalties sustained, but they now have appeals pending before the next appellate committee, along with nine other students. A student who falls within the class, George White, was represented by other counsel and continues to be so represented.

The College was reopened on March 23, 1970. The atmosphere on the campus continues to be extremely tense and uneasy. Since the reopening, at least five fires of undisclosed origin have occurred on the campus in a short period of time. A representative of the parents of disciplined students has made demands upon Acting President Graham that he readmit each dismissed or suspended student regardless of the appellate procedures available to him, but he has refused to comply.

DISCUSSION AND CONCLUSION

This action in effect seeks to have this court, upon federal constitutional grounds, reverse the disciplinary actions taken against a large number of the College's student body, as outlined hereinabove. Twenty students had been dismissed or suspended. It was therefore imperative that the matter be disposed of on its merits immediately, otherwise any relief that this court should grant to the plaintiffs would be of no practical consequence since the court initially decided that it would not grant a temporary restraining order without notice, under the circumstances existing on the campus, and especially in view of the past history of the armed takeover in April 1969.

With the consent of counsel for plaintiffs and defendants, and in view of the urgency of the situation, the court heard the matter on its merits six days after the complaint was filed even though the issues at that time had not been sharply defined and no discovery had been undertaken. The question of the court's jurisdiction was allowed to abide the development of the full evidence.

Even if Voorhees was a state supported college, and the affected students were entitled to due process and a protection of their First, Fifth and Fourteenth Amendment rights as con-

tended by plaintiffs, from the record now before the court after a full evidentiary hearing on the merits, and after each side has presented all of its evidence, and filed briefs which have been duly considered, it would still be concluded that the constitutional rights of all of the complaining students, and the members of the classes they represent, have been fully protected by the procedures and actions taken herein by this private college. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5 Cir. 1961); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); 58 A.L. R.2d 903–920; Madera v. Board of Education of City of New York, 386 F.2d 778 (2 Cir. 1967); Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); Knight v. State Board of Education, 200 F.Supp. 174 (M.D.Tenn. 1961); Wasson v. Trowbridge, 382 F.2d 807 (2 Cir. 1967).

■ The credible evidence fully supports the conclusion that the decision to close the College was prompted and motivated by a proper desire to protect its students, faculty, administration and school property from riot and destruction, and not, as contended by plaintiffs, for the purpose of denying any student his constitutionally guaranteed right of peaceful protest. The history of past violence on this campus and the gathering storm of disruption fully justified the administrative decision. Furthermore, having taken that action, the College officials demonstrated their complete good faith by affording full and effective "due process" in the disciplinary proceedings, fully sufficient to meet the requirements of due process imposed on state supported institutions.

■ The court finds no merit to plaintiffs' complaints about the composition of the Disciplinary Committee, the contents of the notice of the charges and hearing, and the methods and procedures used leading up to and during the disciplinary hearings. Since Voorhees is a private institution more summary procedures may well have been employed. The College instead brought charges against 163 students, and notified each specifically of the charges against him, and of his hearing date. The decision to replace the student members of the Discipline Committee against whom charges were brought was justified by the College's rule that a member "otherwise interested" should not sit. Their replacement with other elected student officials has the appearance of fairness, and indeed no complaint is made that it resulted in any prejudice or unfairness.

The notices that were furnished to the students contained as much information as is generally contained in a criminal indictment or information, and therefore fully met the requirements of federal due process. The complaint that the students were not specifically advised by the notices of their right to counsel and to have witnesses available, as provided at page 19, Section G of the 1969–70 Student Handbook involves no federal question. See Stricklin v. Regents of University of Wisconsin, 297 F.Supp. 416 (W.D.Wis. 1969), which was an action by students against the Regents and President of the University for judgment declaring that their suspensions violated the due process of the Fourteenth Amendment to the Constitution. The University Regents, exercising their reserved power to deal directly with a disciplinary case as provided in the By-laws, withheld from the plaintiffs a "right" which the Regents had conferred upon students whose disciplinary cases were dealt with by the University's administration, namely: The "right to immediate hearing on the limited question of whether suspension should remain in effect until the full hearing is completed." The court stated at page 421:

"Whether the Regents have honored their own By-laws is not a federal question. Nor is it a question with constitutional overtones, except to the extent that a procedure required by a by-law coincides with a procedure required by the Constitution of the United States."

Thus, even if the notice of the charges and the hearing given by Voorhees to the affected students did not fully comply with the requirements specified in the Student Handbook no federal question would be involved and no jurisdiction of this controversy would be bestowed upon this court under such circumstances. Nevertheless, each student was informed of all of his rights by reference to his copy of the Student Handbook which had been provided upon his registration at the College, and those appearing at disciplinary hearings were informed of these rights in person by the Chairman of the Discipline Committee.

■■■ Plaintiffs' contentions that the hearings and appeals were predetermined or ineffective are conclusively refuted by the variety of results reached. It cannot be seriously contended that the disposition of any case was arbitrary, or not related to the evidence produced against him. There is not a scintilla of evidence in the record to establish such contentions.

■■■ Although it was not specifically set forth in their complaint, it is assumed that the plaintiffs seek to invoke the jurisdiction of this court pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). The complaint contains the allegation that "Voorhees College while operating as a private institution is, in fact, quasi public in terms of the vital public service it offers and its intricate inseparable involvement with the public and state government." Plaintiffs' post-trial brief also asserts that "The defendants' operation as a private institution so effected a public interest or its intricate involvement with governmental functions are such that it cannot escape the prohibitions of the First, Fourteenth and Fifth Amendment of the federal Constitution", and that the operation of the College is therefore in effect state action.

There were also allegations of federal assistance to the College and proof from plaintiff's witnesses that it receives some such assistance for construction, scholarships and student aid. Since federal action is not the concern of 42 U.S. C. § 1983, this court's jurisdiction cannot be invoked from that fact.

■■■ Plaintiffs allege abridgment of their rights protected by the First, Fifth and Fourteenth Amendments to the Constitution, but the allegations, as well as the proof, establish that the actions complained of were at the hands of the two individual defendants and the defendant private college, with no state involvement or overtones.

Defendants moved at the conclusion of the plaintiffs' case to dismiss the complaint for lack of jurisdiction since there was no evidence of state action either directly or indirectly. The court reserved its ruling until all evidence which either party desired to present was considered, so that it might determine if there were any indicia of state participation in the action complained of. It has found none.

## CONCLUSIONS OF LAW

Title 42, Section 1983 of the United States Code provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This statute creates a substantive right against any person who " * * * under color of any statute, ordinance, regulation, custom, or usage, of any State * * * *" violates the First Amendment rights of college students through disciplinary action. Saunders v. Virginia Polytechnic Institute, 417 F. 2d 1127 (4 Cir. 1969). This substantive right may be enforced in a federal court

under the jurisdiction created by Title 28, Section 1343(3) of the United States Code which provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \* \*

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

It is to be observed that the jurisdiction of federal courts to hear complaints of the type here presented is limited to deprivation of constitutional rights " \* \* \* under color of any [State law], statute, ordinance, regulation, custom or usage \* \* \*." This is, in effect, the same limitation that exists within the substantive right.

What constitutes "state action" is a matter to be determined after a full evidentiary hearing. The United States Supreme Court has observed that:

"Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

The plaintiffs' claim is that Voorhees College performs a "public function." This contention is dealt with in all of its aspects in Powe v. Miles, 407 F.2d 73 (2 Cir. 1968). There the court pointed out that a college campus is not public property nor is education an exclusively governmental function. Even where the state has created a college by special legislation, regulated it extensively and contributed substantially to its support, there must be the additional element that some action by the state is the subject of the complaint rather than private action.

In this case, there is no showing that the state created or regulates Voorhees College in any manner or to the slightest degree. It contributes nothing to its support, and it is not even remotely involved in the disciplinary action complained of. Its campus is not public property nor is its function that of government. There being no state action, it follows that there is no federal jurisdiction of the matters here complained of. Powe v. Miles, *supra*; Browns v. Mitchell, 409 F.2d 593 (10 Cir. 1969). In *Browns* suspended private University students brought action for injunctive relief in nature of reinstatement under Civil Rights Act against University officials and trustees. The Tenth Circuit, speaking through Chief Judge Murrah, affirmed the district court for the District of Colorado holding that suspension of students, who had engaged in sit-ins in a non-public area of the building in the private University which received no state funds but enjoyed a specific tax exemption not enjoyed by other like corporations did not constitute action taken under "color of state law" within meaning of the Civil Rights Act, Section 1983, *supra*. The Court stated at page 594: "It is axiomatic that the due process provisions of the Fourteenth Amendment proscribe state action only and do not reach acts of private persons unless they are acting 'under color of state law.'" (Citing several United States Supreme Court decisions). To like effect see Grossner v. Trustees of Columbia University and City of New York, 287 F.Supp. 535 (S.D.N.Y. 1968), which involved an action by students at a private University to restrain disciplinary proceedings against them. District Judge Frankel held that the State of New York, which was not shown to have been involved in the disciplinary proceedings against the students who had occupied the University buildings was not shown to have so insinuated itself into position of interdependence with the University as to have rendered the University's acts "state acts" subject to review by federal district court; and

the fact that the private university performed a public function in educating persons did not render its conduct "state action" so as to be subject to federal constitutional requirements. The court denied the students' motion for injunctive relief.

Applying the foregoing legal principles to the instant factual situation it is concluded that plaintiffs' motion for injunctive relief cannot be granted first, because they have failed to establish jurisdiction in this court to enjoin the College's disciplinary proceedings; and second, even if it were concluded that jurisdiction existed there is no factual basis on the merits for awarding such relief. It is, therefore,

Ordered that plaintiffs' complaint be, and the same hereby is dismissed.