Thomas Russell Jones, J.
In this CPLR article 78 proceeding, two students at Long Island University seek to enjoin the university authorities to renew their residence contract and to prevent their ouster from a dormitory apartment, until they have been served with charges of alleged misconduct and afforded a hearing thereon before a faculty student judicial review board. Petitioners claim that by terminating the contract, without filing charges against them and granting them a hearing, the respondent has violated their constitutional rights to due process under the Fourteenth Amendment to the United States Constitution and section 11 of article I of the New York State Constitution. Petitioners also contend that the university’s actions will deprive them of "equal educational opportunities” although their status as students has not been disturbed.
The university has cross-moved to dismiss the petition on the grounds that the so-called "dormitory contracts” were terminated as a matter of right reserved in the contracts and *395 that the termination of the petitioners’ occupancy was effected as an administrative decision, in accordance with the rules and regulations of the institution. The respondent disputes the petitioners’ claim that its refusal to renew their residency contract will deprive them of any constitutionally protected right, or of "equal educational opportunities” in the university.
The petitioners’ motions for a temporary and permanent injunction are denied. Respondent’s motion to dismiss the petition is granted.
The petitioner, Vinston Miller, is a paraplegic. He and the copetitioner, Fred Patterson, occupy an apartment together in a Long Island University residence facility, known as Conolly Hall, located at 190 Willoughby Street, in Brooklyn, pursuant to identical written contracts dated May 5 and June 2, 1975, respectively. The dormitory contracts entitled the petitioners, as students enrolled in the Long Island University Center, to occupy a room together for the summer 1975 semester.
Long Island University is a private, nonprofit institution of higher education. The university receives substantial Federal and State aid and subsidies. Paragraph 8 of the dormitory contract incorporates by reference "All the rules, regulations and procedures outlined” in a 38-page document titled the Spring 1975 Resident Student Handbook. The contract provides, inter alia, that any violation of its terms or the handbook rules "will result in disciplinary action and possible termination.” On July 1, 1975 Conolly Residence Hall Director notified petitioners by letter that their residencies would be terminated as of September 29, 1975, "Although no formal charges (had) been referred” against them, and informed them that "we base our decision on the right of the University to establish rules and regulations regarding residence hall living, as well as the right to deny accommodations to any student whose conduct has been deemed unsuitable for dormitory living.” The termination letter advised the students to seek other housing accommodations. The petitioners, represented by attorneys from the Legal Aid Society of New York, then began negotiations with the university authorities to remain in residence, which culminated in a signed stipulation dated August 27, 1975, whereby they agreed to quit Conolly Hall by September 26, 1975. Notwithstanding the stipulation, petitioners continued to occupy the residence facilities beyond the fixed date and appealed to the student government association *396 which intervened on their behalf with the university president. By letter dated October 3, 1975, President Clark rejected the student government association’s appeal that petitioners be allowed to remain in residence. The president denied the students’ charges that their ouster from the residence hall was arbitrary or that its action inherently maligned their reputations. The president’s letter was published in Seawanhaka, the school newspaper, to refute the petitioners’ suggestions that the university’s refusal to renew their residence contract constituted an implication of criminal behavior or stigmatized them.
No due process or other constitutional issue is involved here. No State action arises from the fact that Long Island University, a private institution, receives substantial governmental aid and subsidies. The law of this case is as stated in Grafton v Brooklyn Law School (478 F2d 1137, 1142): "while a grant or other index of state action may be impermissible when it 'fosters or encourages’ discrimination on the basis of race, the same limited involvement may not rise to the level of 'state action’ when the action in question is alleged to affect other constitutional rights.” (Emphasis added.)
In Grossner v Trustees of Columbia Univ. in City of N. Y. (287 F Supp 535, 547-548), the Federal District Court for the Southern District, New York, set forth the policy reasons which prompts judicial reluctance to invoke the "State action doctrine” in regard to private universities, saying: "that receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government. Otherwise, all kinds of contractors and enterprises, increasingly dependent upon government * * * would find themselves charged with 'state action’ in the performance of all kinds of functions we still consider and treat as essentially 'private’ for all presently relevant purposes.”[1] The petitioners rely on the cases of Board of Regents v Roth (408 US 564 [a nontenured assistant professor at a State College who was not rehired]); Perry v Sindermann (408 US 593 [a college professor at State College who was not rehired]); Velger v Cawley (525 F2d 334 [a probationary policeman discharged from the Police Department of City of New York]); Lombard v Board of Educ. of City of N. Y. (502 F2d *397 631 [a dismissed probationary teacher]); Matter of Jackson v Wallach (48 AD2d 925 [a probationary hospital attendant at Brooklyn State Hospital who was fired]); Matter of Mengrone v New York City Off-Track Betting Corp., 83 Misc 2d 105 [a dismissed provisional employee of the New York City Off-Track Betting Corp.]), to support their due process claims. These cases involved the removal or dismissal of employees from their jobs with State agencies or quasi-public bodies. They bear no resemblance to the issues in this case. It is settled law that public employees enjoy property interests in their civil service positions and may not be dismissed without a hearing, or in accordance with due process. There is no analogy between the historically developed due process rights of public servants to protection in their employment and a student who occupies a residence facility under a contract with a university. Courts have consistently refused to apply the "State action” doctrine or extend due process rights to students attending private universities. (Cf. also other jurisdictions, viz.: Robinson v Davis, 447 F2d 753, cert den 405 US 979; Bright v Isenbarger, 445 F2d 412; Blackburn v Fisk Univ., 443 F2d 121; Browns v Mitchell, 409 F2d 593; Rowe v Chandler, 332 F Supp 336; McLeod v College of Artesia, 312 F Supp 498; Counts v Voorhees Coll., 312 F Supp 598, affd 439 F2d 723; Torres v Puerto Rico Jr. Coll., 298 F Supp 458; Greene v Howard Univ., 271 F Supp 609, dsmd as moot 412 F2d 1128.)
The United States Court of Appeals, for the Second Circuit, in Wahba v New York Univ. (492 F2d 96, cert den 419 US 874), declared that a private university which receives Federal or State moneys does not thereby automatically become an agency or instrumentality of government. (Cf. also Grafton v Brooklyn Law School, 478 F2d 1137, supra ; Grossner v Trustees of Columbia Univ. in City of N.Y., 287 F2d 535, supra ; Powe v Miles, 407 F2d 73). The jurisdiction of Federal courts cannot be invoked merely because a private college receives Federal assistance. (Cf. Counts v Voorhees Coll., 312 F Supp 598, 606, affd 439 F2d 723, supra), except that courts will enjoin a university to respect "one constitutional command, a prohibition of racial discrimination” by those engaging in Federally financed projects (Wahba v New York Univ., supra, p 102).
The petitioner, Vinston Miller, claims that he will be deprived of equal educational opportunities in the university by *398 the nonrenewal of his residency contract because of his paraplegic condition. He says that his physical handicap, now facilitated by the proximity of Conolly Hall to the campus and classrooms, will make it impossible for him to continue his studies at Long Island University. Miller asserts that his family resides in Westchester and cites the difficulty he will encounter in finding a new apartment, to support his contention that he will be forced to discontinue his education at the university’s Brooklyn Center. It appears that Conolly Hall is equipped to accommodate handicapped students, like Miller, who use wheelchairs, and is therefore uniquely suited to facilitate his special needs.
Students in private institutions of higher learning are not clothed with the protections of the United States Constitution and amendments, except when racial discrimination is practiced against them and probably where irrelevant standards of ethnic background or sex are used to exclude them from full participation in a university which benefits from State aid or tax exemption (cf. San Antonio School Dist. v Rodriguez, 411 US 1, 35). In Flemming v Adams (377 F2d 975, 977-978), the court said: "The United States Constitution does not secure * * * the right to an education; rather the Constitution secures the * * * right to equal treatment where the state has undertaken to provide public education to the persons within its borders.”
Vinston Miller’s projected ouster from residence in Conolly Hall will undoubtedly cause him considerable inconvenience but this ownership right the university certainly has. The petitioners do not claim racial discrimination nor have they proved that "unequal treatment” of any kind was practiced by the university as between them and other students in residence.
Neither the contract nor the rules of the university provide for a hearing before the faculty student judicial review board in a case of this kind. The basic relationships between students and a private university are contractual and traditional. From the ninth century, when the first European university, a medical school, was established in Salerno, the university has been a close-knit, self-governing community of higher learning which made and applied its own internal rules and disciplines. (Cf. People ex rel. Cecil v Bellevue Hosp. Med. Coll. of City of N. Y., 60 Hun 107, affd 128 NY 621; Goldstein v New York Univ., 76 App Div 80; Booker v Grand Rapids Med. Coll., 156 *399 Mich 95; Barker v Bryn Mawr Coll., 278 Pa 121; Stetson Univ. v Hunt, 88 Fla 510; Anthony v Syracuse Univ., 224 App Div 487; Matter of Carr v St. John’s Univ., N. Y., 17 AD2d 632, affd 12 NY2d 802; Greene v Howard Univ., 271 F Supp 609, supra.)
The cases of Anthony v Syracuse Univ. (supra), and Carr v St. John’s Univ. (supra), are classical examples of a university’s exclusive control over its own internal affairs. In Anthony, a student was expelled because she was said to be not a "typical Syracuse girl.” After investigating rumors about her behavior, the school authorities dismissed Ms. Anthony because they disliked her life style. The Appellate Division, Fourth Department, held that the officials were not obliged to give reasons for dismissing the student on such vague grounds because she had signed a registration card which reserved to the university the right to demand her withdrawal at any time and for any reason it deemed appropriate. In Carr, two students attending a Catholic university married each other in a civil ceremony and were forthwith expelled for not acting in conformity with Christian ideals and conduct. Since they had consented to this strict religious standard at registration, the court sustained the students’ ouster notwithstanding that their actions were in keeping with public policy which views religious beliefs and practices as personal and inviolate.
The petitioners’ motions for a preliminary injunction and for a permanent injunction are denied. The respondent’s cross motion for a judgment dismissing the petition is granted.

. Public universities are recognized as instrumentalities of the State and constitutional protections are available to their students (cf. Dixon v Alabama State Bd. of Educ., 294 F2d 150, cert den 368 US 930).