MARILYN BILUT, Plaintiff-Appellee, v. NORTHWESTERN UNIVERSITY, Defendant-Appellant.

First District (3rd Division)   No. 1—93—0248

Opinion filed December 30, 1994.

Sidley & Austin, of Chicago (Lawrence I. Kipperman and Scott E. Gross, of counsel), and Martha P. Mandel, of Northwestern University, of Evanston, for appellant.

Joanne Kinoy, of Chicago, for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Marilyn Bilut, by her complaint alleged that defendant, Northwestern University, breached its contract with her when it did not award her a Ph.D. degree. In count I of her complaint, plaintiff sought specific performance. In count II, she sought contract damages from defendant. Plaintiff later amended her complaint to add Professor Gerald Canter as a defendant and to include counts III and IV, which were claims for tortious interference with contract and punitive damages against him. The trial court found in favor of defendant on count I and transferred counts II, III and IV to the law division for a determination of damages. Defendant now appeals. The

sole issue for review by this court is whether the trial court erred in awarding plaintiff a mandatory injunction. We reverse and remand.

Plaintiff was a candidate for a Ph.D. degree in speech and language pathology. In order to be recommended for a Ph.D. degree, a student admitted to candidacy must successfully complete each of the following steps: (1) prepare a prospectus which is acceptable to the dissertation director and the dissertation committee members, all of whom are selected by the student; (2) undertake original and creative research; (3) complete a written dissertation based upon that research; and (4) pass an oral examination. An acceptable prospectus is a research plan for a dissertation. In a prospectus, the student sets forth scientific questions to be answered in the dissertation; demonstrates how those questions fit into the previous research in the field; explains how the research will contribute original and creative knowledge to the field; and describes in detail the methodology of research. An acceptable prospectus demonstrates that the student has carefully thought through the research design and is capable of undertaking and completing the research. The dissertation committee is a group composed of three faculty members chosen by the candidate. The committee reviews the prospectus drafts and determines whether or not the student's proposed research is feasible and would contribute something new to the field in which the student wants to obtain a degree. It is also the responsibility of the student to select and obtain a dissertation director who provides one-on-one guidance to the student during the prospectus and dissertation phases of the student's candidacy.

Plaintiff began working on a prospectus in apraxia. Plaintiff asked Professor Canter to be her director. Plaintiff selected a prospectus committee which, in addition to Professor Canter, consisted of Professors Larson, Rutherford, Smith and Trommer. Plaintiff consulted with Professor Canter on the prospectus during the period from early 1984 through November of 1985. Plaintiff decided to work on the topic of apraxia even though Professor Canter advised her to choose another topic. Professor Canter's recommendation was based upon the fact the plaintiff had difficulties with that topic prior to her admission to candidacy.

During this period, plaintiff accused Professor Canter of having "usurped" her research idea. Plaintiff reported this accusation to Professor Larson, Professor Gregory, chairman of the speech and language pathology program, and Professor Logemann, chairman of the department of communication sciences and disorders. Professor Logemann recommended to plaintiff that she ask Professor Burns, an adjunct professor in the speech and language pathology program who

had expertise in aphasia and apraxia, to replace Professor Canter as plaintiff's dissertation director. Plaintiff, however, decided to continue working with Professor Canter.

In the fall of 1985, Professor Canter concluded, after providing academic counseling to plaintiff for a year and a half, that continued academic counseling on his part would not help plaintiff improve her prospectus. He decided that plaintiff's prospectus should be presented to her full dissertation committee for review. Professor Canter convened the committee in the hopes that it would confirm or correct his judgment about plaintiff's work and provide collective guidance to plaintiff. Each of the members of plaintiff's dissertation committee independently reviewed her draft prospectus. Each member concluded that the prospectus had serious flaws and was unacceptable. Plaintiff presented her proposed research and the committee asked her questions. The committee then asked her to leave the room, after which they concluded that plaintiff's prospectus was unacceptable and that plaintiff should be told that there were serious deficiencies which needed to be corrected in order for her to proceed to a successful dissertation. Professor Canter then summarized the committee's conclusions and communicated them to plaintiff.

After this meeting, plaintiff, however, elected to continue working on her chosen topic. She prepared a second draft prospectus on the same topic and submitted it to each committee member. Each member reviewed the draft and met on January 29, 1986, to discuss it. The consensus of the committee was that the latest draft of plaintiff's prospectus was also unacceptable and that it would not lead to a performable dissertation project. Many of the material flaws and omissions in the prospectus that were previously discussed with plaintiff at the November 1985 meeting remained. Plaintiff was informed in detail of the problems with her prospectus by a letter from Professor Canter dated February 4, 1986. The letter re-stated the advice that the committee gave her in November of 1985. The committee, by this letter, advised plaintiff to pursue a topic other than apraxia because it was clear to the committee that she had not adequately conceptualized research questions and research methods on that topic.

Thereafter, plaintiff asked Professors Logemann and Gregory to convene and attend another meeting because plaintiff felt that the committee did not understand what she was attempting to do. Professors Logemann and Gregory nevertheless granted her request for a third meeting. In addition, plaintiff prevailed upon Professor Logemann prior to the meeting and asked her to review the latest draft of her prospectus. Professor Logemann did so and independently

concluded that the draft was unacceptable for a number of reasons. The third meeting to review plaintiff's prospectus occurred on March 17, 1986. Again, the faculty members present deemed plaintiff's work unacceptable. They each concluded that in order for plaintiff to be able to successfully complete a dissertation, she should select a topic other than apraxia.

Despite having been told that she should pursue a topic other than apraxia, plaintiff submitted a third prospectus on apraxia to Professors Canter and Larson. In June and October of 1986, Professors Gregory and Logemann wrote letters to plaintiff reiterating the previous conclusions and admonitions of the committee concerning her prospectus. In a December 1986 meeting attended by Professors Gregory and Logemann, plaintiff was again informed of deficiencies in her prospectus in writing and told that she should select a topic other than apraxia.

In early 1987, plaintiff accepted the recommendation of the faculty and began to work on a new topic, which was the use of acoustic analysis of speech to distinguish between two types of aphasics. For the next year and a half, members of the faculty provided guidance and assistance to plaintiff with respect to this prospectus. She first sought assistance from Professor Carrell. After reviewing an outline of her proposal, he agreed to work with her and to be on her dissertation committee. On Professor Carrell's recommendation, plaintiff also asked Professors Burns, Sapir and Smith to be on her dissertation committee and to review her proposed prospectus. Professor Smith reviewed a number of draft prospectus proposals and sent her a series of lengthy and detailed letters wherein he set forth his criticisms and recommendations for improvement of plaintiff's prospectus. Professors Burns and Sapir relayed their conclusions about plaintiff's draft prospectus to her in conversations with her, and via letters and comments written on her prospectus draft. Each of the abovementioned professors who evaluated plaintiff's draft prospectus on acoustic analysis found that plaintiff's work was not academically acceptable.

Plaintiff stopped working on her prospectus on acoustic analysis in August of 1988. In September of 1988, she complained to Associate Dean Leila Edwards that she had not received approval from her professors on her prospectuses. In December of 1988, plaintiff submitted a letter to David Cohen, then vice-president for research and dean of the graduate school, complaining about the treatment she had received. Plaintiff accused Professor Canter of having "usurped her idea." She also accused Professor Canter of having asked her "out for drinks" and asked to "spend time with [her]" in 1984 and 1985. At Dean Cohen's request, Associate Dean Edwards contacted

the department, requesting and receiving from all of the professors a detailed response to each of plaintiff's allegations.

In February of 1989, plaintiff requested an extension of time to complete her doctoral program. A Ph.D. candidate is permitted a five-year period from admission to candidacy to complete all of the steps toward being awarded a Ph.D. degree, including preparing an acceptable prospectus, undertaking and completing research, and preparing and defending a dissertation. When the five years of plaintiff's candidacy came to a close in March of 1989, plaintiff had not even completed the first step. An extension is granted only when a student is close to completing her research and dissertation. The faculty voted not to grant plaintiff an extension of time as she had failed to even complete the initial step of the Ph.D. process, and it was unlikely that she could, within a reasonable period of time, complete an acceptable prospectus, find human subjects for her research, undertake the research and prepare and defend a dissertation.

At trial, plaintiff contended that defendant was arbitrary and capricious when it found her draft prospectuses unacceptable. She argued that the academic judgments of the professors who reviewed her various draft prospectuses should be ignored (1) because Professor Canter "usurped" an idea of hers in his Easter Seals proposal; (2) because the same professor made sexual advances to her from 1983 to 1985; (3) because Professor Smith was "biased against" her; and (4) because certain events that occurred during her candidacy were procedurally unfair.

On December 16, 1992, the trial court concluded that defendant's faculty and school officials were "arbitrary and capricious, and/or motivated by bad faith, in their dealings with [plaintiff]." The court based its holding upon the following factual findings regarding the conduct of Professors Canter and Smith, who had reviewed plaintiff's prospectuses: First, the court stated that "Dr. Canter *** usurped much of [plaintiff's] research" and had "surreptitiously utilized much of the information [plaintiff] researched." Second, the court found that Professor Canter engaged in "textbook sexual harassment" when he "asked plaintiff out for drinks" and stated to her "we are both older and we should be together." The court also held that certain actions of defendant during plaintiff's candidacy were unfair and arbitrary and capricious as a matter of law including (1) defendant's precluding plaintiff from attending the January 1986 meeting of the dissertation committee; (2) the failure of the professors who had reviewed plaintiff's work to communicate their criticisms directly to her in a "face to face meeting"; (3) Professor Smith's continuing to

work with plaintiff even though he would rather not have done so; and (4) the inadequate investigation by defendant of plaintiff's accusations of usurpation and harassment. The court, however, did not find that defendant deviated from any of its own policies or procedures or that it had treated plaintiff less favorably than any other student.

The trial court dismissed count I of plaintiff's amended complaint on the ground that "[t]he court will not and cannot compel issuance of [plaintiff's] Doctoral Degree." The court found in favor of plaintiff on count II, the claim for damages for breach of contract, even though that count was not at issue at trial. The court, however, did not rule on defendant's defense that plaintiff did not tender any consideration to defendant after the 1984-85 academic year which could form the basis of the contract that plaintiff alleged that defendant breached. The court also found in favor of plaintiff against Professor Canter on counts III and IV even though Professor Canter had never answered those counts and his motion to dismiss the counts were still pending. The court ordered the transfer of counts II, III and IV, all law counts, to the law division for a determination of damages. The court then issued a mandatory injunction that defendant "grant [plaintiff] an additional two years of study in which to complete her dissertation" after having dismissed count I, which was the only count through which plaintiff sought equitable relief. The court did not enter any findings as to plaintiff's entitlement to said injunction, the irreparable injury she would suffer in the absence of such injunction, or that plaintiff had no adequate remedy at law.

On appeal, defendant first contends that plaintiff's interest in obtaining a degree was not protectible by a mandatory injunction. Specifically, defendant alleges that the trial court erred in granting the extraordinary remedy of a mandatory injunction (1) because plaintiff never requested a mandatory injunction in her complaint, which had been previously stricken by the court; (2) because the injunction was based on legal claims that were not at issue; (3) because plaintiff neither suffered irreparable injury nor was she unable to obtain an adequate legal remedy; (4) because the trial court erred in finding that defendant had contractual obligations to plaintiff; (5) because there was no evidence or finding that plaintiff had a clearly ascertainable right to the remedy she was awarded; and (6) because the relief ordered and the trial court's retention of jurisdiction to oversee plaintiff's academic decision-making process is unworkable. Plaintiff maintains that the trial court properly concluded that she had proven all of the elements necessary for the imposition of the mandatory injunction, that her entitlement is based

on the contractual relationship between the parties and that the trial court has legal authority to fashion equitable relief to safeguard her rights.

We disagree with plaintiff's contention. Plaintiff failed to prove all of the elements necessary to justify the imposition of a mandatory injunction. A mandatory injunction is a drastic remedy which should be ordered only under extraordinary and compelling circumstances. In order to obtain equitable relief, a party seeking an injunction must establish (1) that it has a clear legal right which ought to be protected; (2) that there is no adequate legal remedy; and (3) that irreparable harm will occur if the injunction is not granted. *Mucklow v. John Marshall Law School* (1988), 176 Ill. App. 3d 886, 896, 531 N.E.2d 941, 948; *Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 937, 445 N.E.2d 901, 906.

Regarding the first element, plaintiff failed to prove that she had a certain and clearly ascertainable right to an additional two years to complete her dissertation. During her five years of candidacy, plaintiff failed to prepare an acceptable prospectus. Several of defendant's faculty members deemed plaintiff's prospectus unacceptable. The faculty voted not to grant her an extension of time because they deemed that it was unlikely that she could prepare a prospectus, find human subjects for her research, undertake and complete the research and defend a dissertation within a reasonable period of time.

■ The right of a student to attend a private college or university is subject to the condition that the student comply with its academic requirements. The faculty of a private college or university may formulate and enforce reasonable rules and regulations requiring students to adhere to its standards. *Boehm v. University of Pennsylvania School of Veterinary Medicine* (1990), 392 Pa. Super. 502, 507, 573 A.2d 575, 578; see also *Napolitano v. Trustees of Princeton University* (1982), 186 N.J. Super. 548, 565, 453 A.2d 263, 272; *Schoppelrei v. Franklin University* (1967), 11 Ohio App. 2d 60, 62, 228 N.E.2d 334, 336; *People ex rel. Pacella v. Bennett Medical College* (1917), 205 Ill. App. 324, 324-25.

In addition, in regard to the second factor, plaintiff made no showing, and the court made no finding, that plaintiff would suffer irreparable harm in the absence of being granted an additional two years to complete her dissertation. Plaintiff presented no evidence that she would be able to obtain a degree from defendant if given a two-year extension. Furthermore, although we realize plaintiff put a lot of effort toward obtaining a degree at Northwestern University, plaintiff presented no evidence that her efforts could not be utilized

to obtain a Ph.D. degree from another institution. In order to obtain a mandatory injunction, a plaintiff must show actual and substantial irreparable injury. *Bell Fuels, Inc. v. Butkovich* (1990), 201 Ill. App. 3d 570, 572-73, 559 N.E.2d 164, 166.

Finally, plaintiff did not demonstrate that she had no adequate legal remedy for the alleged injuries she would suffer in the absence of an additional two years to complete her dissertation. In fact, plaintiff brought a breach of contract action against defendant to recover the damages she suffered as a result of defendant's alleged breach of contract. There are many cases which refer to the existence of a contractual relationship between a student and a private college or university. (See *Frederick v. Northwestern University Dental School* (1993), 247 Ill. App. 3d 464, 471, 617 N.E.2d 382, 387; *Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 937, 445 N.E.2d 901, 906; *Abrams v. Illinois College of Podiatric Medicine* (1979), 77 Ill. App. 3d 471, 477, 395 N.E.2d 1061, 1065; *Paulsen v. Golden Gate University* (1979), 25 Cal. 3d 803, 811, 602 P.2d 778, 783, 159 Cal. Rptr. 858, 863; *Miller v. Long Island University* (1976), 85 Misc. 2d 393, 398, 380 N.Y.S.2d 917, 922.) It is the opinion of this court that the relationship between a student and a private college or university is unique and cannot be strictly categorized or characterized in purely contractual terms. (See *Lyons v. Salve Regina College* (1st Cir. 1977), 565 F.2d 200, 202-03; *Slaughter v. Brigham Young University* (10th Cir. 1975), 514 F.2d 622, 626; *Napolitano v. Trustees of Princeton University* (1982), 186 N.J. Super. 548, 566, 453 A.2d 263, 272-73.) Illinois law, however, recognizes the availability of a remedy of monetary damages for a private school's wrongful expulsion of a student. *Bloch v. Hillel Torah North Suburban Day School* (1981), 100 Ill. App. 3d 204, 206, 426 N.E.2d 967, 977.

> "Where the contract is one which establishes a personal relationship calling for the rendition of personal services, the proper remedy for a breach is generally not specific performance but rather an action for money damages. [Citations.] The reasons for denying specific performance in such a case are as follows: the remedy at law is adequate; *** and the concept of compelling the continuance of a personal relationship to which one of the parties is resistant is repugnant as a form of involuntary servitude." (*Bloch*, 100 Ill. App. 3d at 205, 426 N.E.2d at 977.)

In other words, a former student of a private school who claims an entitlement to readmission may not obtain equitable relief in the form of a mandatory order for readmission. (*Bloch*, 100 Ill. App. 3d at 206, 426 N.E.2d at 977.) Even though the *Bloch* case concerned the relationship between a young child and a grade school and not the

relationship between an adult student and a private college or university, the precedent set in *Bloch* governs the present case as defendant's faculty must work closely with its Ph.D. candidates just as defendant's teachers in *Bloch* had to work closely with the young child. Plaintiff, therefore, did have an adequate legal remedy for her injury. In short, the trial court erred in granting a mandatory injunction without any evidence or finding that plaintiff has a clearly ascertainable right to an additional two years to complete her dissertation; that she would be irreparably injured in the absence of such an order; or that she has no adequate legal remedy.

■ Furthermore, we agree with defendant's contention that the remedy awarded to plaintiff is unworkable. In *Board of Curators of the University of Missouri v. Horowitz* (1978), 435 U.S. 78, 92, 55 L. Ed. 2d 124, 136, 98 S. Ct. 948, 956, the United States Supreme Court stated that "[c]ourts are particularly ill-equipped to evaluate academic performance." In keeping with the *Horowitz* case, we maintain that our court is ill equipped to run private colleges and universities. Since the ninth century, when the first European university was established in Salerno, the university has been a close-knit, self-governing community of higher learning which made and applied its own internal rules and disciplines. (See *Miller v. Long Island University* (1976), 85 Misc. 2d 393, 398, 380 N.Y.S.2d 917, 922.) A private educational institution such as defendant sustains essentially voluntary relationships among itself, its students and its faculty. The foundation of these relationships is the understanding that the students will abide by and adhere to the disciplinary regulations and the academic standards established by the faculty and the university; and that upon the satisfactory completion of their studies, they will be awarded a degree in their chosen discipline. (See *Clayton v. Trustees of Princeton University* (D.C.N.J. 1985), 608 F. Supp. 413, 437; *Napolitano*, 186 N.J. Super. at 565-66, 453 A.2d at 272; *Lyons*, 565 F.2d at 202; *Jansen v. Emory University* (N.D. Ga. 1977), 440 F. Supp. 1060, 1062, *aff'd* (5th Cir. 1978), 579 F.2d 45.) Private educational institutions such as defendant have an interest in promoting the academic well being of their students (*Napolitano*, 186 N.J. Super. at 567, 453 A.2d at 273), and in ensuring that the students to whom they award degrees, especially those who will become health care providers, will safely serve the public (see *Jansen*, 440 F. Supp. at 1063; *People ex rel. Pacella v. Bennett Medical College* (1917), 205 Ill. App. 324, 325). To this end, we believe that private colleges and universities must be accorded a generous measure of independence and autonomy with respect to the establishment, maintenance and enforcement of academic standards. (See *Edde v. Columbia University*

(1957), 8 Misc. 2d 795, 796, 168 N.Y.S.2d 643, 644-45, *aff'd* (1958), 6 A.D.2d 780, 175 N.Y.S.2d 556 (It is a university's prerogative to reject a doctoral candidate's dissertation. "The court may not substitute its own opinion as to the merits of a doctoral dissertation for that of the faculty members whom the [u]niversity has selected to make a determination as to the quality of the dissertation").) For the above reasons, we hold that the trial court erred in awarding plaintiff a mandatory injunction.

Defendant also contends that the trial court's ultimate findings of fact and conclusions on the merits were erroneous. Specifically, defendant alleges that the trial court erred in finding that defendant's academic judgment of plaintiff was arbitrary and capricious. We agree.

The standard of review which applies to plaintiff's case is the arbitrary and capricious standard: A university may not act maliciously by arbitrarily and capriciously dismissing or refusing to award a degree to a student on the ground of academic deficiencies if said student fulfills its degree requirements. (*DeMarco v. University of Health Sciences/ Chicago Medical School* (1976), 40 Ill. App. 3d 474, 480, 352 N.E.2d 356, 362; see also *Connelly v. University of Vermont & State Agricultural College* (D.C. Vt. 1965), 244 F. Supp. 156, 159; *Mucklow v. John Marshall Law School* (1988), 176 Ill. App. 3d 866, 891, 531 N.E.2d 941, 944.) A plaintiff's burden of establishing arbitrary and capricious conduct on the part of a private college or university, however, is a heavy one. (*Frederick v. Northwestern University Dental School* (1993), 247 Ill. App. 3d 464, 471, 617 N.E.2d 382, 387.) A plaintiff must show that his dismissal was "without any discernable rational basis." (*Frederick*, 247 Ill. App. 3d at 471-72, 617 N.E.2d at 387; see also *Holert v. University of Chicago* (N.D. Ill. 1990), 751 F. Supp. 1294, 1301.) Courts have adopted this deferential standard because of their reluctance to interfere with the academic affairs of a private college or university. *Holert*, 751 F. Supp. at 1301; *Frederick*, 247 Ill. App. 3d at 472, 617 N.E.2d at 387.

Harassment of a student by tying her academic advancement to her submission to sexual pressures constitutes sex discrimination in education. (*Moire v. Temple University School of Medicine* (E.D. Pa. 1985), 613 F. Supp. 1360, 1366, *aff'd* (3d Cir. 1986), 800 F.2d 1136; *Alexander v. Yale University* (D. Conn. 1977), 459 F. Supp. 1, 4, *aff'd* (2d Cir. 1980), 631 F.2d 178.) Two forms of sexual harassment have been recognized: "*Quid pro quo*" harassment and "abusive environment" harassment. (*Moire*, 613 F. Supp. at 1366.) *Quid pro quo* harassment occurs where specific academic or employment benefits are withheld as a means of coercing sexual favors. 29 C.F.R. § 1604.11 (1994); *Moire*, 613 F. Supp. at 1366.

■ Although plaintiff in the present case alleged that Professor Canter suggested that they "go out for drinks" and "spend time together," said testimony is inconclusive evidence of *quid pro quo* sexual harassment. In fact, plaintiff has failed to meet her burden of proving that defendant was arbitrary and capricious in determining that her prospectus was unacceptable or that the faculty members who reviewed her prospectus based their conclusions on anything other than academic grounds. The evidence presented at trial established that each of the professors who reviewed plaintiff's prospectus made his or her own independent scholarly and academic judgments. Professors Canter, Smith, Logemann, and Trommer all explained to plaintiff the serious problems with her draft prospectuses on apraxia. Professors Carrell, Sapir, Burns and Smith also explained to plaintiff the defects in her draft prospectus on aphasics. In short, the record shows that there was a discernable rational basis for the decisions of defendant and its faculty regarding plaintiff's dissertation. We therefore will not overturn a decision by defendant in regard to plaintiff's academic qualifications.

Accordingly, we reverse the trial court's injunction and remand.

Reversed and remanded.

TULLY, P.J., and CERDA, J., concur.