# Illinois Official Reports

## Appellate Court

---

**Bosch v. NorthShore University Health System*, 2019 IL App (1st) 190070**

---

| | |
|---|---|
| Appellate Court Caption | BRANDON BOSCH, Plaintiff-Appellant, v. NORTHSHORE UNIVERSITY HEALTH SYSTEM, an Illinois Not-for-Profit Corporation; DePAUL UNIVERSITY, an Illinois Private University; TRACY FELT; and JULIA FECZKO, Defendants-Appellees. |
| District & No. | First District, Third Division<br>No. 1-19-0070 |
| Filed | December 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-L-6658; the Hon. Margaret Brennan, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Joseph P. Selbka, of Pluymert, MacDonald, Hargrove & Lee, Ltd., of Hoffman Estates, for appellant.<br><br>Jason A. Parson, Luisa F. Trujillo, and Christopher C. Heery, of Anderson, Rasor & Partners, LLP, of Chicago, for appellees NorthShore University Health System, Tracey Felt, and Julia Feczko.<br><br>Scott L. Warner and Karen L. Courtheoux, of Husch Blackwell LLP, of Chicago, for other appellee. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Brandon Bosch was dismissed from a school for nurse anesthetists run by NorthShore University Health System (NorthShore) and DePaul University (DePaul). He sued, claiming that NorthShore and DePaul breached an implied contract when they dismissed him for "wholly invented" reasons. He also pleaded claims for breach of contract based on third-party beneficiary status as well as counts sounding in fraud and spoliation of evidence. He added a claim of tortious interference against the two clinical instructors who allegedly fabricated the charges against him.

¶ 2    The circuit court dismissed each claim with prejudice. We affirm the trial court's judgment in all respects but one. We hold that Bosch stated a claim for breach of an implied contract with both NorthShore and DePaul. While the trial court was understandably reluctant to wade into matters of academic judgment for which courts have long considered themselves ill suited, this case, as pleaded, is not about the school's academic judgment. It is about fabricating charges against a student the instructors did not like, to run him out of the school on the eve of his graduation. Bold and difficult to prove as they may be, these allegations, if true, would state a claim for breach of an implied contract.

¶ 3    To that extent and only that extent, we reverse the trial court's judgment and remand for further proceedings.

¶ 4                              BACKGROUND

¶ 5    We take the following facts from Bosch's second amended complaint, which we accept as true at the pleading stage. *Kramer v. Szczepaniak*, 2018 IL App (1st) 171411, ¶ 22.

¶ 6    The complaint alleges that NorthShore and DePaul jointly run the NorthShore School of Nurse Anesthesia (School). Its program trains students to become nurse anesthetists. It consists of two parts: a classroom component administered by DePaul and clinical instruction administered by NorthShore.

¶ 7    If a student successfully completes the program, NorthShore will provide a certificate of completion of the training required to be a nurse anesthetist. If the student is also a degree-seeking student, DePaul would confer a master's degree in nursing. DePaul will not grant the degree unless the student completes the clinical instruction provided by NorthShore. The program is accredited as the "NorthShore University HealthSystem School of Nurse Anesthesia, DePaul University."

¶ 8    In 2010, Bosch enrolled in the School. He successfully completed all clinical and classroom instruction from September 2010 to July 2012. In July, he began his final course, Practicum III. Defendants Tracy Felt and Julia Feczko were the preceptors—the clinical instructors—for Practicum III. Bosch claims that due to a "personality conflict," Felt and Feczko "began

manufacturing reasons to discipline Plaintiff and eventually have [him] dismissed from the program."[1]

¶ 9    On July 26, Bosch was placed on probation for alleged problems in Practicum III. In accordance with the program's student handbook, Bosch received a notice detailing the reasons he was being placed on probation. The notice stated that Bosch (1) failed to prepare routine anesthesia equipment, (2) failed to correlate anesthetic requirements with monitored parameters and surgical events, (3) required frequent reminders to provide routine equipment, (4) failed to manage intra-operative problems, (5) failed to comply with the controlled substance policy, (6) was disorganized in setting up for cases, (7) failed to anticipate progress of cases, (8) was unable to multitask, and (9) was unable to think critically and solve problems during case management.

¶ 10   While he was on probation, Felt and Feczko continued to treat Bosch with hostility and "continued to use false and arbitrary, or subjective but distorted reasons" to fail him. A month later, in August, Bosch met with the directors of the program to discuss his probation. At this meeting, Bosch claims the School was unwilling to entertain the idea that Felt and Feczko's criticisms were illegitimate. After this initial meeting, the School continued Bosch's probation for another 30 days. At the end of the continued probation, as a result of Felt and Feczko's "misrepresentations and misimpressions of Plaintiff's performance," Bosch was told to withdraw from the program or be dismissed.

¶ 11   Bosch's second amended complaint contains the following claims: breach of implied tuition contract against NorthShore and DePaul (counts I and III), third-party beneficiary breach of contract against NorthShore and DePaul (counts II and IV), breach of implied contract (agency theory) against DePaul (count V), fraud against NorthShore and DePaul (count VI), intentional interference with contractual relationship against Felt and Feczko (count VII), and spoliation of evidence against NorthShore and DePaul (count VIII). Counts VI and VIII were included solely to preserve them for appeal.[2]

¶ 12   Bosch alleges that on July 17, 2012, just before Bosch was placed on probation, Felt and Feczko made false accusations against him. Specifically, Felt "wrongly accused Plaintiff of not having suction available at a patient's bedside during intubation," and Feczko "falsely accused Plaintiff of a serious violation of narcotics policy for a small paperwork error." He claims that the probation notices contain numerous false allegations and "grossly" distorted the facts which led to his probation and dismissal. He directly refutes each of the claimed deficiencies by alleging that:

"a. [Felt and Feczko] wholly invented the incident on July 17, 2012 regarding Plaintiff allegedly not having suction available for a patient during intubation.

b. [Felt and Feczko] wholly invented the claim that Plaintiff failed to prepare routine anesthesia equipment;

c. [Felt and Feczko] wholly invented the claim that Plaintiff failed to correlate anesthetic requirements with monitored parameters and surgical events;

---

[1]We use the spelling of Ms. Feczko's name from her appearance below.

[2]We refer to the spoliation claim as "count VIII" because it was the last count of the second amended complaint and followed count VII. It is mislabeled "Count 10" in the second amended complaint, presumably a typographical error based on its position in an earlier complaint.

d. [Felt and Feczko] wholly invented the claim that Plaintiff required frequent reminders to provide routine equipment;

e. [Felt and Feczko] wholly invented the claim that Plaintiff failed to properly manage intra-operative problems;

f. [Felt and Feczko] grossly distorted Plaintiff's performance in claiming Plaintiff was disorganized;

g. [Felt and Feczko] grossly distorted Plaintiff's performance in claiming Plaintiff failed to anticipate progress of cases;

h. [Felt and Feczko] grossly distorted Plaintiff's performance in claiming Plaintiff was unable to think critically and solve problems during case management;

i. [Felt and Feczko] grossly distorted Plaintiff's performance in claiming Plaintiff was unable to multitask; and

j. [Felt and Feczko] wrongly accused Plaintiff of violating narcotics policy."

¶ 13    The distortions alleged above were so serious and so wildly departed from plaintiff's actual performance as to amount to misrepresentations. The complaint also alleges that other students with similar skill sets and performance were not expelled or put on probation.

¶ 14    As for the contract claims, Bosch alleges that Felt and Feczko's behavior, and his subsequent dismissal, breached the implied contract to provide him an education. Finally, he pleaded that NorthShore and DePaul have either an agency relationship or are engaged in a joint venture, such that DePaul can be held liable for the actions of Felt and Feczko—both of whom were employed by NorthShore.

¶ 15    The trial court ruled that Bosch's contract claims fell into the category of nonjusticiable academic decisions. The court likewise dismissed the claim for tortious interference and again dismissed the fraud and spoliation claims. Bosch timely appealed.

¶ 16                              ANALYSIS

¶ 17    Bosch says the court erred by granting defendants' section 2-615 motions to dismiss. A section 2-615 motion tests the legal sufficiency of the complaint based on defects on its face. *O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 18. Attached exhibits are part of the complaint and must be considered when determining whether the complaint is defective. *Kirchner v. Greene*, 294 Ill. App. 3d 672, 678 (1998). The court must take as true all well-pleaded facts in the complaint and accept all reasonable inferences that may be drawn from those facts. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 27. We review an order of dismissal *de novo*. *Kramer*, 2018 IL App (1st) 171411, ¶ 22.

¶ 18                                 I

¶ 19    One way in which Bosch seeks to hold defendants liable in contract is by claiming that the School had a contract with the body that provides it accreditation, the Council on Accreditation of Nurse Anesthesia Educational Programs (the Council). Bosch claims that he is a third-party beneficiary of that alleged contract. We agree with the trial court that these counts fail to state a claim.

¶ 20    The United States Department of Education (DOE) does not accredit schools directly but grants authority to private entities to do so. The Council is a nongovernmental accrediting body that claims to have been recognized since 1975 by the DOE. Among other things, accreditation

by a DOE-approved body makes a school eligible for certain federal funding and its students eligible for federal student loan programs. (There appear to be other benefits as well, such as the ability of students to transfer credits between accredited schools.) The accrediting agency sets standards for accreditation—some quite specific, many more general and aspirational. A school applies for accreditation in part surely for reputational purposes but also because it " 'want[s] a key that would unlock the federal Treasury.' " *Sojourner-Douglass College v. Middle States Ass'n of Colleges & Schools*, No. ELH-15-01926, 2015 WL 5091994, at *42-43 (D. Md. Aug. 27, 2015) (quoting *Chicago School of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schools & Colleges*, 44 F.3d 447, 449 (7th Cir. 1994)).

¶ 21     An accrediting body, then, is much like a traditional administrative agency, " 'a proxy for the federal department whose spigot it opens and closes.' " *Id.* (quoting *Chicago School*, 44 F.3d at 449). It can change its standards at any time, unilaterally. It can change its accreditation decision regarding a particular school at will, too. See *Chicago School*, 44 F.3d at 449. The relationship between accrediting body and school is thus not one of contract; it is more akin to that of a licensing body to an entity it regulates:

> "[A]ccrediting bodies are not engaged in commercial transactions for which state-law contract principles are natural matches. The 'contract' the School wants to enforce is not a bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency. Accreditation groups adopt and change their rules unilaterally; by posting an application fee a trade school cannot lock in a favorable set of rules." *Id.*

¶ 22     For that reason, courts have consistently refused to apply contract law to actions involving accreditation disputes. See, *e.g.*, *id.*; *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools & Colleges*, 781 F.3d 161, 181 (4th Cir. 2015) ("The Standards of Accreditation do not constitute a binding contract between the [accreditor] and the accredited educational institutions because the [accreditor] can alter the alleged 'contract' at will and, thus, is not bound by its terms."); *Foundation for Interior Design Educational Research v. Savannah College of Art & Design*, 244 F.3d 521, 532-33 (6th Cir. 2001) (foundation's decision to deny accreditation to college was not actionable in breach of contract); *Tsamota Certification Ltd. v. ANSI ASQ National Accreditation Board LLC*, No. 17-CV-839-JPS, 2018 WL 1936840, at *7 (E.D. Wis. Apr. 24, 2018) (board's accreditation determination "was not a relationship of mutual assent to bilateral promises. Rather, [the board] alone controlled the process and could change its rules at any time without input from [the school]," and thus school's "remedy is not in a breach of contract action").

¶ 23     And because there is no contract between a school and an accrediting body, there obviously can be no third-party beneficiary to a nonexistent contract. See, *e.g.*, *Castrillon v. St. Vincent Hospital & Health Care Center, Inc.*, 51 F. Supp. 3d 828, 842-43 (S.D. Ind. 2014) (plaintiff doctor was not third-party beneficiary of accreditation agreement between defendant hospital and its accreditor, as plaintiff could not identify enforceable contract between those entities); *Dr. Erik Natkin, DO PC v. American Osteopathic Ass'n*, No. 3:16-CV-01494-SB, 2019 WL 1763242, at *12 (D. Or. Apr. 22, 2019) (medical student was not third-party beneficiary of accreditation agreement between institution and accrediting body).

¶ 24     The third-party beneficiary claims in counts II and IV were properly dismissed.

## II

Bosch also alleges the breach of a direct contract with the School—an implied contract to provide him an education and a degree. He cites case law recognizing implied-contract actions in the private education setting, as well as written promises contained in either the School's student handbook or in certain standards promulgated by the body that accredited the School.

## A

"An implied contract arises where the intention of the parties is not expressed but an agreement in fact creating an obligation is implied or presumed from their acts—in other words, where circumstances under common understanding show a mutual intent to contract." *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill. App. 3d 146, 154 (1998). Like any other contract, an implied contract must contain the traditional elements of offer, acceptance, and consideration. *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977); *Brody*, 298 Ill. App. 3d at 154.

Illinois law generally recognizes an implied contract between a student and a school (at least a private school, as here). See *Bilut v. Northwestern University*, 269 Ill. App. 3d 125, 133 (1994) (collecting cases). The student's tender of an application is the offer; the school's admission of the student, the acceptance; the student's payment of tuition in exchange for the school's promise of a degree, the consideration; the student's satisfactory completion of the coursework, her performance; and the grant of a degree upon satisfactory completion, the school's performance. *Steinberg*, 69 Ill. 2d at 330; *Johnson v. Lincoln Christian College*, 150 Ill. App. 3d 733, 739 (1986); *Bilut*, 269 Ill. App. 3d at 134 ("foundation" of school-student contract is that students will abide by disciplinary and academic standards "and that upon the satisfactory completion of their studies, they will be awarded a degree in their chosen discipline"); see also *Galdikas v. Fagan*, 342 F.3d 684, 692 (7th Cir. 2003) ("Illinois courts have found that the payment of tuition to an educational institution ordinarily gives rise to an implied contract that the school will award a degree upon the student's satisfaction of the degree requirements established by the school"), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004); *Williams v. Wendler*, No. 05-4157-JPG, 2007 WL 329131, at *1 (S.D. Ill. Feb. 1, 2007) ("Illinois has recognized that payment of college tuition gives rise to an implied contract that the school will award a degree").

That is not to say that there are no differences between implied school contracts and more traditional, commercial contracts. Indeed, we have recognized

> "a valid distinction between a 'commercial case' and a case involving an implied contract between a college and a student. In a commercial case ***, the material terms of an alleged contract are generally complex and unique to a particular set of circumstances, and cannot be implied. On the other hand, the traditional implied contract between a college and a student is much more standard and less complex than that which usually exists in a commercial setting." *Johnson*, 150 Ill. App. 3d at 739.

So while in a traditional commercial contract action the plaintiff must point to a particular contract provision—one sufficiently definite to constitute an enforceable promise—that the defendant breached, a breach of an implied private school contract might consist of nothing more than a claim that the student paid her tuition, satisfactorily performed her coursework, and was wrongly denied her degree (or advancement toward that degree). The wrongful dismissal or denial of degree is the breach.

¶ 32     The catch, no small one, is how we define the wrongful denial of the school degree—that is, how we define the breach. In this regard, school-expulsion cases involving academic decisions stand on a very different footing than garden-variety breach-of-contract actions. That is because courts have long expressed their reluctance to second-guess the decisions of educators on questions of academic performance. See *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 92 (1978) ("Courts are particularly ill-equipped to evaluate academic performance."). We have recognized that the relationship between a student and a private college or university "is unique and cannot be strictly categorized or characterized in purely contractual terms." *Bilut*, 269 Ill. App. 3d at 133. We thus afford colleges and universities "a generous measure of independence and autonomy with respect to the establishment, maintenance, and enforcement of academic standards." *Harris v. Adler School of Professional Psychology*, 309 Ill. App. 3d 856, 859 (1999); see also *Bilut*, 269 Ill. App. 3d at 134.

¶ 33     So a court will not change the grade on a term paper from a C-minus to a B-plus. Nor will we second-guess a school on whether a year-end exam adequately tested the students' understanding of their first-year coursework. See *Harris*, 309 Ill. App. 3d at 859-60. A court will not override the judgment of educators as to whether a doctoral thesis was good enough to warrant a Ph. D. See *Bilut*, 269 Ill. App. 3d at 134-35 (citing *Edde v. Columbia University*, 168 N.Y.S.2d 643, 644-45 (Sup. Ct. 1957)). We will not overturn the judgment of educators even if we find it "unwise" or even if we find that the institution departed somewhat from the terms of a student handbook on matters of procedure. See *Raethz v. Aurora University*, 346 Ill. App. 3d 728, 732-33 (2004).

¶ 34     Instead, we will only reverse an educational institution's academic decision if we find it to be arbitrary and capricious or the product of bad faith or malice. *Seitz-Partridge v. Loyola University of Chicago*, 409 Ill. App. 3d 76, 82 (2011); *Brody*, 298 Ill. App. 3d at 156; *Wilson v. Illinois Benedictine College*, 112 Ill. App. 3d 932, 937 (1983). An academic decision is arbitrary and capricious when it lacks "any discernible rational basis" (internal quotation marks omitted) (*Fredrick v. Northwestern University Dental School*, 247 Ill. App. 3d 464, 471-72 (1993)) or "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible *did not actually exercise professional judgment*" (emphasis added and internal quotation marks omitted) (*Raethz*, 346 Ill. App. 3d at 732).

¶ 35     We note all of this at the outset because Bosch goes to great lengths to identify *written* contractual promises that he claims the School made to him, some contained within the student handbook, others in accreditation standards that applied to the School. And defendants, understandably, isolate each of those alleged promises to argue that they were not promises at all, hoping that if they shoot down each one, Bosch will be out of promises and out of court.

¶ 36     But Bosch does not need a handbook or accreditation standards to state a claim for breach of contract for wrongly dismissing him from the program and denying him a degree. He does not need anything in writing. As noted above, the very foundation of the fundamental implied promise in a private school contract is that, if a student satisfactorily performs the coursework, she will get her degree. *Johnson*, 150 Ill. App. 3d at 739; *Bilut*, 269 Ill. App. 3d at 134. To enforce that unwritten, implied promise, Bosch need not cite any written materials at all. *Johnson*, 150 Ill. App. 3d at 739.

¶ 37     We must be clear on this point. Schools get sued for various reasons, and the implied contract between school and student does not cover all of them. For example, a student may

sue a school because it failed to protect him from bullying; the implied contract does not cover that situation, so to state a claim, the student would have to identify some *other* promise by the school to prevent bullying. See *Mulvey v. Carl Sandburg High School*, 2016 IL App (1st) 151615, ¶¶ 29-33 (student handbook provision regarding bullying not sufficiently definite to be binding contractual promise). Or the student may sue a school for falsely claiming to be accredited; again, that is not typically considered part of the implied contract, so the student would have to identify some other representation or promise of accreditation by the school to hold the school liable in that regard. See *Lidecker v. Kendall College*, 194 Ill. App. 3d 309, 317 (1990) (plaintiff failed to prove that school ever promised accredited status in school catalogue).

¶ 38    But a claim that the student fully performed her coursework and was denied a degree (or was wrongly dismissed and prevented from progressing toward it) is the beating heart of the implied contract between the school and student; the school promises a degree if the student adequately performs her work. *Johnson*, 150 Ill. App. 3d at 739; *Bilut*, 269 Ill. App. 3d at 134; *Galdikas*, 342 F.3d at 692. *That* promise, fundamental to the implied contract, requires no other promise by the school to state a claim. See *Johnson*, 150 Ill. App. 3d at 739 (in claim for wrongful denial of degree, noting that case law recognizes promises contained in documents distributed by school, such as student handbooks, as "*part* of the contract between the student and the school," but noting that "[i]t does not necessarily follow, nor do any of the cases *** require, that a student *must* present such documents to establish the terms of an implied contract between the school and the student" (emphases in original and added)).

¶ 39    That does not mean that other promises, contained in written materials distributed by the School, could not also play a role in a case like this involving wrongful dismissal. Of course, they could. For example, a student might point to a set of procedural protections contained in a student handbook, allege that the school failed to follow them, and offer the school's substantial deviation from published procedures as evidence of the arbitrary and capricious nature of the school's academic decision. See *Raethz*, 346 Ill. App. 3d at 732 ("substantial departure from accepted academic norms" could demonstrate arbitrary and capricious academic decision-making (internal quotation marks omitted)).

¶ 40    So we are not foreclosing the relevance of any such promises contained in a school's published materials. We are simply noting that, if the claimed breach is a breach of the implied promise to grant a degree to a student who successfully completed the coursework, nothing more is required than that allegation. Additional terms of the school contract may be alleged, but they are not a prerequisite to the cause of action. See *Johnson*, 150 Ill. App. 3d at 739.

¶ 41    In sum, to state a claim for breach of an implied contract with the School for improperly dismissing him from the School short of a degree, Bosch need only plead that he applied to the School (offer), he was granted admission (acceptance), he paid tuition in exchange for the promise of a degree upon successful completion of the coursework (consideration), he satisfactorily performed his coursework (his performance), he was thus entitled to a degree or, at least, continued advancement toward that degree (the School's promised performance), and the decision to force him out before he received his degree was arbitrary and capricious or the product of bad faith or malice (the school's failure to perform—its breach). *Id.*; *Bilut*, 269 Ill. App. 3d at 134.

¶ 42    Bosch has pleaded every one of these elements. Nobody disputes that he pleaded offer, acceptance, and consideration. Whether Bosch "satisfactorily" performed his coursework, thus

triggering the School's performance of giving him a degree (or at least allowing him to stay in school in pursuit of one), is the sticking point here. The trial court, understandably reluctant to substitute its judgment for those of academicians, believed that the court's role was to be "hands off" in this context.

¶ 43 The trial court was certainly correct that a plaintiff faces a tall hurdle in proving that an academic decision lacked "any discernible rational basis" (internal quotation marks omitted) (*Fredrick*, 247 Ill. App. 3d at 471-72) or departed so sharply from accepted academic norms that it was, in effect, the product of no professional judgment whatsoever and instead was motivated by bad faith or malice. *Raethz*, 346 Ill. App. 3d at 732; *Seitz-Partridge*, 409 Ill. App. 3d at 76; *Brody*, 298 Ill. App. 3d at 156. But we are not at the proof stage. We are at the pleading stage.

¶ 44 The complaint here alleges that Bosch's clinical instructors, defendants Felt and Feczko, "wholly invented" criticisms of and charges against Bosch because they did not like him. See *supra* ¶ 12. He is not merely alleging that they were mistaken. He is not simply claiming that their judgment was poor. He is saying they made things up to run him out of the School and deny him a degree. If those claims are not allegations of bad faith, malice, and the absence of any valid professional judgment, it is hard to imagine what allegations *would* suffice.

¶ 45 If the facts show that Bosch cannot prove these claims, and the case boils down to whether the school personnel were correct or justified in their academic judgments, he will likely lose. But we obviously do not have those facts at the pleading stage, and we typically wait for them before deciding whether a student like Bosch has a case. Indeed, most of the case law in Illinois that upheld academic decisions came after some measure of discovery and evidence, rendered at trial or at least summary judgment. See, *e.g.*, *Seitz-Partridge*, 409 Ill. App. 3d at 86 (summary judgment); *Raethz*, 346 Ill. App. 3d at 733-34 (trial); *Brody*, 298 Ill. App. 3d at 156 (trial); *Bilut*, 269 Ill. App. 3d at 136 (trial); *Frederick*, 247 Ill. App. 3d at 473 (summary judgment).

¶ 46 And while *Harris*, 309 Ill. App. 3d at 858, is an example of a dismissal at the pleading stage, no discovery or fact-finding was necessary for us to conclude that the question presented there—whether the school's final exam was an appropriate test of that year's curriculum—was the very kind of second-guessing of academic decision-making that we scrupulously avoid. That complaint, in other words, on its face asked the court to substitute its own academic judgment for that of the educators.

¶ 47 Here, in contrast, the complaint alleges that academic judgment had nothing to do with Bosch's dismissal. If the allegations are true, as we assume at this stage, the court is not being asked to sit in the stead of educators. The question is the motive, intent, and sincerity of the clinical instructors and other supervisors and advisors, the kinds of questions that the judicial system is well equipped to adjudicate. The complaint states a claim for breach of an implied contract between Bosch and the School. Counts I and III should not have been dismissed.

¶ 48                                                                  B

¶ 49 The complaint, as noted, alleges the breach of several promises contained in certain written materials disseminated or at least referenced by the School. As we explained above, it is not necessary for Bosch to plead, much less prove, breaches of any of these promises to state a claim here—not when the claim is for wrongful dismissal and denial of a degree. Still, because nothing stops Bosch from attempting to rely on additional promises in an effort to prove that

his dismissal was a breach of his implied contract and to guide the court on remand, we will consider these additional alleged promises.

¶ 50    The complaint here cites two sources of written contractual promises: those contained in the student handbook and those found in the Council's Standards for Accreditation of Nurse Anesthesia Educational Programs (Council Standards).

¶ 51                                                                    1

¶ 52    We start with the school handbook. The law is settled that representations in school handbooks may create enforceable contractual promises. See, *e.g.*, *Mulvey*, 2016 IL App (1st) 151615, ¶¶ 29-33; *Seitz-Partridge*, 409 Ill. App. 3d at 82. Whether the provisions in the student handbook do, indeed, constitute contractual promises in a particular case depends on their language. The complaint cites three breaches of contract arising from promises made in the student handbook, which was Exhibit A to the complaint:

"a. Plaintiff was not provided formative evaluations necessary to allow him to correct his deficiencies. (Ex. A, Evaluation Section);

b. Plaintiff was not appropriately advised and not provided feedback by his advisor related to Plaintiff's performance and appeal rights with Plaintiff when Plaintiff discussed his situation with his advisor (Ex. A, Advisory Section)[;]

c. Plaintiff was not provided appropriate assistance from his advisor when he sought his advisor out regarding his performance and ways to challenge his probation and dismissal (Ex. A, Advisory Section)[.]"

¶ 53    We are hindered by the fact that the complaint does not specify the language contained in either the "Evaluation" or "Advisory" sections that contained an enforceable promise. It is difficult to analyze whether a particular provision is sufficiently definite to constitute a binding promise when we do not even know which provision the plaintiff is citing.

¶ 54    The "Advisory" section is not that long, however, and we quote it in its entirety here:

"Nurse anesthetist trainees (NATs) are assigned an advisor at the beginning of each academic year and are expected to meet with their advisor on a regular basis.

A. At a minimum, NATs will make contact with their advisors quarterly to discuss their clinical performance, didactic performance, professional behavior, and any other issues of concern.

B. School administrators maintain an open-door policy for NATs and are readily available in person during school hours or via phone and email during after-hours and weekends.

C. NATs are responsible for monitoring their own didactic performance and seeking assistance from the instructor or their advisor;

1. NATs will receive a grade warning via email, any time a course grade falls below 86% with a ≥ 50% of the course completed.

2. Advisors may request a meeting or schedule a phone conference with a NAT anytime their performance or behavior is unsatisfactory."

¶ 55    Other than perhaps a promise that a student will be assigned an advisor, this section of the handbook contains no definite promise to the student. Indeed, most of the provisions discuss

the *student's* obligations. We find nothing specific in this section regarding the content of the advisor's feedback to the student or any requirement of notice to students of their appeal rights.

¶ 56    To be clear, what we mean by this is that we find no relevant enforceable promise in this "Advisory" section. We do *not* mean to imply that the behavior of Bosch's advisor, who is referenced several times in the complaint, is out of bounds in this case. Bosch alleges that his advisor (who was also the program's assistant director) turned a deaf ear to Bosch's plea for assistance in the face of his clinical instructor's criticisms, failed to serve as Bosch's advocate in the process, failed to advise him of his internal appeal rights, and at least on information and belief, took steps to *hinder* his appeal rights. While that conduct may not stand independently as a breach of an enforceable promise, we would not foreclose the possibility that this behavior might be evidence in this case to prove the ultimate claim that Bosch makes—that his dismissal was arbitrary and capricious or was motivated only by malice or bad faith.

¶ 57    The third and final claimed promise relating to the student handbook pertains to the "Evaluation" section. Again, Bosch does not cite any particular provision contained in this section, which takes up three pages of the handbook. As the complaint references inadequacies in the "formative evaluations," we presume that we should focus on the single paragraph in that section devoted to "formative evaluations." That provision, in its entirety, reads as follows:

> "Clinic instructors complete Daily Clinic Evaluations. The instructors will address deficiencies or areas needing improvement noted during case management. NATs are responsible for providing instructors with a daily clinic evaluation tool and recording these submissions on their daily Typhon record. A NAT who has less than 3 evaluations/week may receive a probationary warning/probation. NATs receive a compiled monthly clinic evaluation and deficiencies in clinic performance and opportunities for improvement will be discussed in a meeting with a coordinator. The coordinator will notify the School if a NAT is not meeting practicum objectives."

¶ 58    The complaint alleges that Bosch "was not provided formative evaluations necessary to allow him to correct his deficiencies." As defendants note, that is not quite the same thing as saying that the instructors provided no formative evaluations whatsoever. Indeed, the complaint lists multiple complaints and charges that Felt and Feczko (his clinical instructors) leveled against him, which Bosch claims were "wholly invented." It is tempting to assume that those claims were made in those daily clinic evaluations. The complaint is not clear on this point.

¶ 59    But it is clear enough on this point: The "formative evaluation" section promises that clinical instructors will give feedback that "address[es] deficiencies or areas needing improvement noted during case management," and Bosch has clearly alleged that his instructors, defendants Felt and Feczko, made no real attempt to fulfill that role but, rather, trumped up phony charges against him to get him removed from the program. The complaint thus adequately alleges that the School violated an enforceable promise contained in the first two sentences of the "formative evaluation" provision of the "Evaluation" section of the student handbook. The failure to comply with that provision, if proven, might provide evidence in support of Bosch's ultimate claim of breach of contract for his dismissal. See *Raethz*, 346 Ill. App. 3d at 732 ("substantial departure from accepted academic norms" could demonstrate arbitrary and capricious academic decision-making (internal quotation marks omitted)).

¶ 60

¶ 61 That brings us to the complaint's allegations of promises made by the School that were contained in the Council Standards regarding accreditation. For several reasons, we hold that these Council Standards did not create enforceable promises by the School to Bosch.

¶ 62 We already discussed above that the Council is a private accreditation body, having been delegated authority from the DOE to accredit schools that provide coursework and degrees in nurse anesthesia. We explained that courts have consistently found no contractual relationship between accrediting bodies and the schools they accredit, that the relationship is more like an administrative agency's relationship to an entity it regulates. See *Chicago School*, 44 F.3d at 449; *Professional Massage*, 781 F.3d at 181; *Foundation for Interior Design*, 244 F.3d at 532-33.

¶ 63 That presents the first problem for Bosch. For the same reasons that the School cannot interpret these standards as enforceable contractual promises, neither can Bosch. As explained above, "[a]ccreditation groups adopt and change their rules unilaterally; by posting an application fee a trade school cannot lock in a favorable set of rules." *Chicago School*, 44 F.3d at 449. The Council Standards' prefatory language includes that very proviso: "The standards have been under review and have been subject to periodic major and minor revisions since they were established." In other words, the Council does not guarantee that its standards will stay the same for a specified amount of time; quite to the contrary, the Council reserves the right to change them at any time without the approval of the various schools it reviews.

¶ 64 So if Bosch claims here that he relied on these Council Standards—including multiple individual ones that he cites—he must take the bad with the good. He also must be presumed to have read and understood that, through no control of the School, those Council Standards could change at any time, in any way. It is difficult to imagine how Bosch could interpret these standards as being concrete, definite contractual promises by the School when those promises could evaporate entirely or be revised in ways "major and minor" by an entity (the Council) that is not a party to the implied school contract.

¶ 65 Nor, second of all, is there any allegation or independent reason to believe that the School, through its representations, incorporated these Council Standards into the implied school contract. The complaint alleges that the School advertised that it was accredited by the Council and that it complied with the Council's standards. The two things are one and the same; the Council would not accredit the School unless, in the Council's judgment at least, the School satisfactorily complied with its standards. That is a far cry, however, from alleging that every single of one of these Council Standards (over 40 pages' worth) were incorporated into the implied contract with the School. We are aware of no written language distributed by the School (and none has been quoted to us, much less attached to the complaint) that would support such a broad proposition.

¶ 66 If the School misrepresented its accreditation status in its published materials to Bosch, the School would be liable on that basis alone, for a school obviously cannot lie to student applicants about its accreditation status. See, *e.g.*, *Jamieson v. Vatterott Educational Centers, Inc.*, 259 F.R.D. 520, 538 (D. Kan. 2009) (recognizing cause of action exists against school for falsely claiming accredited status); *Cavaliere v. Duff's Business Institute*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992) ("We can fathom no policy against permitting a cause of action for breach of contract or misrepresentation where, for example, a private trade school *** has asserted that it is accredited or licensed to give a certain degree and it is later discovered that this is

false.”); *cf. Lidecker*, 194 Ill. App. 3d at 317 (holding that plaintiff failed to prove that school ever actually promised accredited status in its catalogue).

¶ 67        But the complaint contains no such allegation. There is no claim that the School was *not* accredited at all relevant times. And saying that one is accredited is saying nothing more or less than the simple fact that the Council has deemed it worthy of its blessing. It is not, by itself, an incorporation into the school contract of the entirety of the standards of the Council, writ large.

¶ 68        Third, what little case law we have uncovered on this topic has concluded, albeit with little analysis, that accrediting bodies' standards are not incorporated into implied school-student contracts. See *Galligan v. Adtalem Global Education Inc.*, No. 17 C 6310, 2019 WL 423356, at *6 (N.D. Ill. Feb. 4, 2019) (rejecting incorporation of accreditation standards into implied contract between student (Galligan) and school (Ross): “Galligan appears to reference the AVMA accreditation standard that ‘[s]tudent support services must be available within the college’ and ‘must include . . . support for students with learning or other disabilities,’ *** which was at most an agreement between the AVMA and Ross, not between Ross and Galligan.”); *Amaya v. Brater*, 981 N.E.2d 1235, 1241 n.3 (Ind. Ct. App. 2013) (“Although we decline to address [plaintiff student's] claims regarding the LCME accreditation standards in detail, we note our agreement with the trial court that the LCME accreditation standards do not form part of the implied contract between [student] and [school].”).

¶ 69        Fourth and finally, the Council Standards do not contain enforceable promises in any event. It is clear from a review of the Council Standards that they were not intended to be a blow-by-blow instruction manual on how to operate a nursing anesthesia school. Some standards, to be sure, are quite specific (as are some administrative regulations). But most of them are more general, aspirational statements of a desired outcome, such as “fostering student learning,” “promot[ing] professional socialization,” or administering disciplinary policies “in a fair and equitable manner.” The details of how to accomplish those outcomes are left to the individual school, with the Council being the ultimate judge of whether the school's policies and practices live up to that goal.

¶ 70        We have been clear that provisions in school materials must be sufficiently definite in character to constitute a binding promise, as opposed to a general provision discussing a policy, goal, expectation, or guideline. See *Mulvey*, 2016 IL App (1st) 151615, ¶¶ 32-37 (provisions in public school's student handbook did not constitute implied contract, as they were “merely hortatory and convey[ed] no specific promises”); *Harris*, 309 Ill. App. 3d at 861 (finding that nondiscrimination policy “was only a general reference of adherence to existing law concerning discrimination,” not independent contractual obligation). The Council's general aspirational requirements do not satisfy this standard.

¶ 71        And even for those standards cited by Bosch that are more specific and definite, the failure to comply with them is not a deal-breaker in the eyes of the Council. The Council Standards make clear that, while they contain a vast amount of criteria over their 40-plus pages, “[c]ertain criteria have been ascertained to have major significance regarding educational quality,” and the “[f]ailure to fully comply with one or more of these criteria is considered to be of critical concern in decisions regarding nurse anesthesia program accreditation.” That language, in itself, reveals two things: First, some standards are deemed more important than others; second, even the more “significan[t]” ones are not so vital that the failure to follow them is necessarily

fatal—it will be a matter of "critical concern" in the Council's overall assessment of that school.

¶ 72    In other words, the Council has set out a vast number of guidelines that it deems important for a quality nurse anesthesia school, but its review is not simply a box-checking exercise. It will review the school's policies, practices, and procedures to determine if, *overall*, the school deserves its blessing. Some criteria are more important and are noted as such, but even the failure to satisfy a particularly important criterion will not necessarily be fatal. That is to say, a school could violate one of the standards—even a critical one—and theoretically still receive accreditation if the Council determines, in its exclusive, subjective judgment, that the school's overall practices and policies warrant accreditation. To cherry-pick a few standards from the massive tree, as Bosch has, and deem each of them independent contractual promises runs counter to how the Council itself expressly views its standards.

¶ 73    To summarize: The complaint states a claim for breach of an implied contract between Bosch and the School. The Council Standards are not enforceable promises and are not part of the implied contract. The promises in the student handbook regarding "formative evaluations," as discussed above, are enforceable promises. If Bosch proves that the School failed to comply with those promises, that fact could be considered as evidence of a breach of the implied contract, along with any other evidence Bosch can present that demonstrates that the School's actions were arbitrary and capricious.

¶ 74                                                    III

¶ 75    In its final, brief argument in its written response, but one that was featured rather prominently at oral argument, NorthShore says that Bosch's failure to avail himself of the School's internal appeal process requires the dismissal of the entire complaint. The complaint references an appeal process without elaboration or citation and defensively alleges that NorthShore employees took steps to prevent Bosch from availing himself of that procedure. Still, NorthShore claims that Bosch was charged with knowledge of the appeal process and cites an appellate decision for the proposition that "administrative remedies must be exhausted before pursuing judicial remedies." *Gates v. Holy Cross Hospital*, 175 Ill. App. 3d 439, 448 (1988).

¶ 76    The exhaustion doctrine is typically employed in challenges to actions of administrative agencies and generally provides that, before seeking court redress of agency action, the plaintiff must pursue all administrative remedies. See *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 308 (1989). It is a common-law doctrine that was later codified in the Administrative Review Law. *Id.* at 321; see 735 ILCS 5/3-101, 3-102 (West 2018).

¶ 77    That doctrine has no application here. There is no governmental agency involved here. This is a contract dispute between private parties. Any "duty" Bosch might have to first pursue "administrative remedies" before filing suit in court would not come from the common law nor from a statute—it would have to be a duty spelled out in the *contract*.

¶ 78    However its argument is styled, if NorthShore could cite a *contractual* requirement that Bosch utilize internal appeal procedures as a mandatory precondition—that is, a condition precedent—to the filing of a lawsuit, it could claim that this lawsuit (or part of it) was barred for the failure to initiate those internal proceedings. See, *e.g.*, *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 206 (1993) (requirement that contractor and owner first refer disputes to architect for decision before suing in court to

- 14 -

challenge architect's decision was condition precedent to filing of lawsuit); *Radiant Star Enterprises, L.L.C. v. Metropolis Condominium Ass'n*, 2018 IL App (1st) 171844, ¶ 60 (" 'if a provision creating a condition precedent to litigation is shown, a party refusing to comply with it may be barred from pursuing claims in court.' " (quoting *Mayfair*, 249 Ill. App. 3d at 206)). The contractual language must so state " 'expressly or by clear implication.' " *Mayfair*, 249 Ill. App. 3d at 206 (quoting *Hill v. Mercury Record Corp.*, 26 Ill. App. 2d 350, 356 (1960)).

¶ 79 But here, NorthShore has cited no contractual language whatsoever to support its claim that this entire lawsuit is barred. It notes that the complaint refers to the internal appeal procedure, which it does, albeit vaguely and without citation. But rather than fill in the gaps, NorthShore simply argues that because the complaint alleges an internal appeal process and Bosch did not utilize it, he is barred from suing NorthShore, full stop. That is obviously insufficient.

¶ 80 At oral argument, in explaining the source of Bosch's contractual duty to employ the internal appeal procedures, NorthShore referenced the student handbook. We presume that counsel was referring to the "Problem Resolution" section of that handbook. But we find nothing in that section that says that a student is *required* to employ internal appeal processes; it simply provides that the student "has the right to appeal" an adverse decision to the "Problem Resolution Committee." And it says absolutely nothing about litigation in court. It comes nowhere close to qualifying as a condition precedent to the filing of a lawsuit in court.

¶ 81 We thus reject NorthShore's claim that this suit is barred by Bosch's failure to utilize NorthShore's internal appeal process.

¶ 82                                                                    IV

¶ 83 DePaul has an argument unique to itself. It says that the portion of the program where the claimed breach occurred—the clinical portion—was run by NorthShore, not DePaul. And even the complaint alleges that the clinical instructors, defendants Felt and Feczko, were NorthShore employees. Thus, DePaul cannot be held liable for any breach of contract (or other wrongdoing) that may have occurred by NorthShore employees.

¶ 84 Bosch, on the other hand, says the complaint pleads two alternative theories of liability against DePaul. See 735 ILCS 5/2-613(b) (West 2018) (permitting alternative pleading). First, DePaul was part of a joint venture with NorthShore. Alternatively, NorthShore was DePaul's agent—his claim in count V of the second amended complaint. Under one of these theories, says Bosch, DePaul is liable for any breach of contract by a NorthShore employee.

¶ 85 A joint venture is similar to a partnership and is governed by the same legal principles. *Herst v. Chark*, 219 Ill. App. 3d 690, 694 (1991). The difference is that "a joint venture relates to a single enterprise or transaction, while a partnership relates to a general business of a particular kind." *Id.*; see also *Bachewicz v. American National Bank & Trust Co. of Chicago*, 75 Ill. App. 3d 252, 256 (1979). "[T]here must be a community of interest in the performance of the common purpose, a proprietary interest in the subject matter, a right to direct and govern the policy, and a right to joint control." *Prassas v. Nicholas W. Prassas & Co.*, 94 Ill. App. 3d 311, 315 (1981). A formal agreement is not essential, and the existence of a joint venture may be inferred from the parties' conduct. *Kaporovskiy v. Grecian Delight Foods, Inc.*, 338 Ill. App. 3d 206, 212 (2003). But neither does a formal agreement necessarily mean that the parties undertook a joint venture. See *id.* (finding no joint venture, as parties' written agreement did not provide necessary degree of joint control).

¶ 86     On the other hand, a principal-agent relationship exists when the principal can control how the agent performs the work and the agent can subject the principal to liability. *Saletech, LLC v. East Balt, Inc.*, 2014 IL App (1st) 132639, ¶ 15. The existence of such a relationship can be demonstrated circumstantially, "including the situation of the parties, their acts, and other relevant circumstances." *Id.*; see also *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 72; *Knapp v. Hill*, 276 Ill. App. 3d 376, 382 (1995).

¶ 87     Then there is the doctrine of apparent agency, where the purported agent does not possess *actual* authority to act on behalf of the principal, but the principal, by some manifestation to a third party or the public, has "cloaked" the agent in such a way to give the reasonable impression that the agent has actual authority. See *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523 (1993); *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107, ¶¶ 31-32.

¶ 88     For his allegation of a joint venture, Bosch heavily relies on the School's joint accreditation as "NorthShore University HealthSystem School of Nurse Anesthesia DePaul University." He alleges that NorthShore and DePaul "seek joint applicants to the program; jointly sought and seek accreditation in the program; jointly determine which students graduate from the program; and provide joint degrees from the program." Indeed, as made clear by the student handbook attached to the complaint: "Degree seeking individuals, who successfully complete the graduate program, will receive a Diploma in Nurse Anesthesia from NorthShore University HealthSystem School of Anesthesia and a Master of Science in Nursing from DePaul University." The complaint adequately alleges a joint venture between NorthShore and DePaul.

¶ 89     But from the School's joint accreditation, the complaint also alleges that DePaul "cloaked Northshore with authority over instruction in the program and evaluating Plaintiff's clinical work" and, more importantly, that "DePaul named Northshore personnel who oversaw the clinic programs as adjunct professors for DePaul." And DePaul does not grant a degree to students unless NorthShore determines that the student has satisfactorily completed the clinical portion of the coursework. At the pleading stage, that is sufficient to allege either actual or apparent agency.

¶ 90     DePaul says its relationship with NorthShore was a mere "educational affiliation," whatever that means, by which they "can and do each administer one of the two separate components of the program." We are not aware of the legal significance of an "educational affiliation" or whether it would foreclose a joint-venture or principal-agent relationship.

¶ 91     In any event, it is far too preliminary to know the true relationship between DePaul and NorthShore. They may be a joint venture. Their relationship may be one of principal-agent of one kind or another. They may be none of those things, in which case DePaul may have the right to avoid any responsibility for the actions of which Bosch complains. We hold only that the complaint adequately alleges each theory in the alternative. Thus, the complaint properly alleges a breach of contract, as discussed above, as to DePaul as well as NorthShore. Counts I, III, and V should not have been dismissed.

¶ 92                                                    V

¶ 93     Next is Bosch's claim against Felt and Feczko for tortious interference with contractual relationship. Bosch must plead (1) a valid contract between plaintiff and a third person, (2) that defendant was aware of the contractual relationship, (3) defendant's intentional and unjustified

interference, (4) that a breach occurred because of the interference, and (5) damages. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55 (1989). The circuit court dismissed this claim, finding that Felt and Feczko are "employees of NorthShore in this case. And, in essence, you're asking that they be found to interfere with their own contract in this case. It doesn't get there."

¶ 94 We would note at the outset that the complaint alleges that the portion of the school contract that was breached by Felt and Feczko were the Council Standards. We have already held that those standards are not part of the contract. For that reason alone, we could affirm the trial court's dismissal of this count.

¶ 95 In any event, even if the complaint had been properly pleaded, the circuit court's reasoning was correct. A party cannot tortiously interfere with its own contract. *Koehler v. The Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 43. This rule extends to agents, though an agent's privilege from liability is not absolute. *Citylink Group Ltd. v. Hyatt Corp.*, 313 Ill. App. 3d 829, 841 (2000); *Storm & Associates, Ltd. v. Cuculich*, 298 Ill. App. 3d 1040, 1051-52 (1998).

¶ 96 "[S]o long as a fellow employee is acting in accordance with the interest of the employer, no personal liability" will attach to that employee. *Salaymeh v. InterQual, Inc.*, 155 Ill. App. 3d 1040, 1045 (1987). But a plaintiff can overcome the agent's privilege against liability by alleging and proving that the agent "acted in its own interest and contrary to the interests of its principal, or engage[d] in conduct totally unrelated or antagonistic to the interest giving rise to the privilege." *Citylink*, 313 Ill. App. 3d at 841; *Koehler*, 2016 IL App (1st) 142767, ¶ 44 (finding that defendants were properly found liable for tortious interference, as plaintiff presented evidence that defendants "acted in their own self-interest, outside the scope of their duties, and to the detriment of plaintiff and the corporate defendants"). As long as the conduct of the party is directed towards the interest of the employer, "any personal bitterness and hostility [is] immaterial." *Salaymeh*, 155 Ill. App. 3d at 1045.

¶ 97 It is beyond question here that Felt and Feczko were NorthShore's (and arguably DePaul's) agents, at least as pleaded. It is likewise clear that their conduct, as pleaded, was performed in the scope of their employment while acting as preceptors for Practicum III. No doubt, Bosch alleged that Felt and Feczko performed their duties *improperly* in fabricating claims against him, but that does not change the fact that they were performing clinical evaluations of Bosch as their duties entailed. They were performing a clear job function, even if they did not do so, in Bosch's eyes, properly.

¶ 98 As Felt and Feczko were acting as the program's agents and within the scope of their authority in conducting their evaluations of Bosch, they cannot be personally liable for tortiously interfering with the School-Bosch implied contract. The court correctly dismissed count VII.

¶ 99 VI

¶ 100 We next consider Bosch's spoliation claim in count VIII.

¶ 101 Illinois does not recognize an independent tort for spoliation of evidence. *Dardeen v. Kuehling*, 213 Ill. 2d 329, 335 (2004). Instead, an action for negligent spoliation must be brought under the traditional elements of negligence—duty, breach, and damages proximately caused by the breach. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 194-95 (1995). Generally, "there is no duty to preserve evidence; however, a duty to preserve evidence may

arise through an agreement, a contract, a statute [citation] or another special circumstance." *Id.* at 195; see *Dardeen*, 213 Ill. 2d at 336.

¶ 102    Bosch alleges that "Northshore and DePaul had a duty under the *Council Standards* to preserve all records associated with evaluating Plaintiff for the reasons set forth above." (Emphasis added.) But the Council Standards did not impose that or any other duty. They do not do so by *contract* for the reasons we have already given—the School did not *have* a contract with the Council, nor did it incorporate those standards into its implied contract with Bosch.

¶ 103    They did not in any other way, either. The Council has no authority to make the School do anything. The School did not, and still does not, have to follow the Council Standards. It *chooses* to do so because it wants something back from the Council—accreditation. But the Council holds no legal authority over the School sufficient to impose a legal duty on the School.

¶ 104    The trial court correctly dismissed count VIII.

¶ 105                                                    VII

¶ 106    Finally, we consider Bosch's fraud claim in count VI. The trial court dismissed Bosch's fraud claim after finding that he did not meet the heightened pleading requirements. Again, we agree with the trial court.

¶ 107    To plead fraud, plaintiff must allege facts to show (1) a false statement of fact, (2) knowingly made by the defendant, (3) made with the intent to induce plaintiff to act, (4) the plaintiff's justifiable reliance on the false statement, (5) and that such reliance caused plaintiff to suffer damages. *Abarzari v. Rosalind Franklin University of Medicine & Science*, 2015 IL App (2d) 140952, ¶ 14. "[P]leadings must contain specific allegations of facts from which fraud is the necessary or probable inference." *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 31 (2003).

¶ 108    We focus on the alleged misrepresentation because we agree with the trial court that it is insufficient to state a claim for fraud. Bosch pleads that "Northshore and DePaul advertised that the program was accredited and followed the Council Standards when Plaintiff enrolled and in July, 2012 when Northshore and DePaul violated the Council Standards." He further claims that the institutions should have known that their agents, Felt included, had a history of "fail[ing] to adhere to the Council Standards."

¶ 109    This claim fails for similar reasons that Bosch's breach-of-contract claim based on the Council Standards failed to state a claim. The School represented that it was accredited. By all accounts, that representation was true (the complaint does not allege that statement to be false). The School's representation that it followed the Council Standards was a different way of saying the same thing—the Council awarded the School accreditation because it found its compliance with Council Standards to be adequate. These representations were not false as a matter of law; indeed, they were *true* as a matter of law. The trial court correctly dismissed count VI.

¶ 110                                              CONCLUSION

¶ 111    The dismissal of counts I, III, and V, sounding in breach of contract against NorthShore and DePaul, is reversed, and the cause is remanded for further proceedings consistent with what we have said above. In all other respects, the judgment of the circuit court is affirmed.

¶ 112        Affirmed in part and reversed in part; cause remanded.